IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Rochester Division

---

**LARRY PRATT, William Robinson,**
**Stephen J. Aldstadt, David Bardascini,**
**Michael P. Carpinelli, George Curbelo, Jr.,**
**Wayne Denn, William R. Fox, Sr., Don Hey,**
**Garry Edward Hoffman, Raymond Kosorek,**
**Michael R. Kubow, Thomas J. Lorey,**
**Thomas A. Marotta, Michael Mastrogiovanni,**
**Kenneth E. Mathison, Terrence J. McCulley,**
**Jim Nowotny, John E. Prendergast,**
**Harold W. Schroeder, Edward J. Stokes,**
**John W. Wallace, Leslie H. Wilson,**
**Christopher S. Zaleski, Mattie D. Zarpentine,**
and all those other individuals who are
similarly situated,

          Plaintiffs

    *vs.*

**LORETTA LYNCH**, Attorney General
of the United States of America,
**James B. Comey**, Director of the Federal
Bureau of Investigation, **Christopher M. Piehota**,
Director of the Terrorist Screening Center,
and **Thomas E. Brandon**, Acting Director of the
Bureau of Alcohol, Tobacco, Firearms
and Explosives,

          Defendants.

**COMPLAINT**

Civil No.: 6:15-cv-6765

---

## COMPLAINT

### (For Declaratory Judgment and Injunctive Relief)

Plaintiffs, as individuals, do hereby, through their attorney, allege against Loretta Lynch, Attorney General of the United States of America, James B. Comey, Director of the Federal Bureau of Investigation, Christopher M. Piehota, Director of the Terrorist Screening Center, and Thomas E. Brandon, Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, as follows:

## Defendants' Use of Confidential Information on Gun Owners is Illegal.

1. All Americans have a fundamental right to own, possess, and transfer firearms, including for a range of purposes from sporting to self-defense of the home and family. The federal government has enacted nine, specific categories of persons who, through their actions and omissions and after a rigorous legal course, can be deemed to have forfeited their privileges under the Second Amendment of the United States Constitution.[1] Being a named person on a "terrorist watch list" is not a federal statutory disqualifying factor, nor should it be. Permanent deprivation of a fundamental civil right cannot and should not occur because something as small as an alleged, anonymous tip places an individual in a secret database managed by the Attorney General, the FBI, and/or the TSC to which the individual has no right of access and no method of recourse.

---

[1] See: 18 U.S.C. §922(g)(1)-(9).

2.   In order to exercise their fundamental rights under the Second Amendment, potential purchasers of firearms are subjected to a pre-purchase background check known as the "NICS Firearms Background Check," which compares the customer's identifying information against records associated with the federal disqualifying factors, such as being an illegal alien or having a felony conviction.

3.   The legal spirit of the statutes and associated regulations of the NICS Firearms Background Check is unusual in that the design places strong and clear limitations on the government's access to, retention of, and use of the personal information supplied by the potential customer of a firearm.

4.   The essential design of the NICS Firearms Background Check creates a tight relationship between the customer (an individual), the store (which is a private business), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF"). Information transmission is under highly specific circumstances, including that the ATF should be bringing the disqualifying information into its data realm, not be publishing information outward to the general community of offices and agencies under the auspices of the Attorney General.

5.   The NICS Firearms Background Check relies upon information voluntarily supplied by a potential customer of a firearm to a federally-licensed dealer (hereafter, "FFL dealer") upon a form titled "ATF Form 4473."

6.   The personal information supplied by the customer on the ATF Form 4473 is confidential, as a matter of law, and the ATF widely publicizes the restrictions upon and penalties associated with misuse of this information in order to entice potential gun buyers to conduct their firearms transactions through an FFL dealer.

7.   The ATF makes legally accurate, affirmative representations to customers and FFLs that the limited information submitted from the ATF Form 4473 to the ATF through the FFL is confidential to the FFL dealer and to the ATF, that no database will be amassed nor registry created, that the information will be promptly purged, and that only in very limited and specific criminal investigation circumstances will any additional information from the ATF Form 4473 be transmitted to the minimum law enforcement offices necessary to apprehend the alleged criminal or to trace the recovered stolen firearm.

8.   No individual consents to a waiver of privacy through the completion of the ATF Form 4473.

9.   No individual consents to the retention of their personal information and their potential firearms purchase information through the completion of the ATF Form 4473.

10.   The ATF Form 4473 is a physical piece of paper.[2]

---

[2] The ATF did begin an electronic filing system for the ATF Form 4473, the same remains optional to the FFL dealer.

11.     It is the private FFL dealer – and not the federal government – that acts as the
        repository for and guardian of the ATF Form 4473.

12.     The FFL dealer is required to retain the ATF Form 4473 for a period of
        twenty years.[3]  And, if and when the FFL dealer terminates operations, it must
        transmit these and other original records to the ATF repository.

13.     The NICS Firearms Background Check takes place in two parts.  First, the FFL
        dealer contacts the ATF to provide partial data from the ATF Form 4473, limited to
        the name, date of birth, gender, race, state of residence, and (if provided) Social
        Security Number of the potential customer.  The rest of the information on the
        form and the photographic identification provided is not transmitted to the ATF.
        Additional information that goes onto the ATF Form 4473 that is not transmitted in
        the initial ATF contact includes the manufacturer, model, and serial number of the
        firearm that may be purchased if the customer does not fail the background check.

14.     There are only three instances at law through which the ATF would gain access to
        the paper version of the ATF Form 4473 and, thus, the balance of the additional,
        available information:  (1.) during a routine audit, conducted no more than once per
        12-month period; (2.) after an FFL dealer has ceased operations and performed the
        mandatory submission of certain, enumerated records to the ATF permanent
        repository; and, (3.) as part of a criminal investigation.

---

[3] If a sale is not completed, the FFL dealer obligation for retention of the ATF Form 4473 is only five years.

15.    No person is required to complete a purchase of a firearm, even if the background check is negative for any disqualifying factor.

16.    No FFL dealer is required to complete a firearms sale, for any reason, even if the potential customer has a negative background check.

17.    There is no expectation that any information supplied by the potential customer through the FFL dealer will be used by the federal government for any purpose other than a specific background check against the nine categories of federal disqualifying factors.

## Defendants Treat Every Potential Gun Owner Like a Terrorist.

18.    On November 30, 1998, the ATF NICS Firearms Background Check became available on a nationwide basis (hereafter "NICS launch date").

19.    Without any legal authority to do so, since at least February 2004, the Federal Bureau of Investigation (the "FBI") has carried out a fully-operational cross-check system between the NICS Firearms Background Check and the "Terrorist Screening Database."[4]

20.    From November 30 1998 through November 30, 2015, a total of 222,363,898 NICS Firearm Background Checks were conducted by the ATF.

---

[4] For purposes of this pleading, the term "Terrorist Screening Database" is used to collectively represent the current database name and all predecessor and feeder databases. The "Terrorist Screening Database" is also commonly referred to as the "Terrorist Watchlist," as acknowledged by the Terrorist Screening Center.

21.     On or after February 2004, the FBI, TSC, and ATF ran every NICS Firearms

        Background Check against the Terrorist Screening Database, without the legal

        authority to do so.

22.     As of December 31, 2014, the FBI alleges that 2,233 persons, or, 0.001% of the

        total persons processed through the NICS Firearm Background Check were also

        cross-listed in the "Terrorist Screening Database."

23.     The Terrorist Screening Center ("TSC") in conjunction with the FBI and the ATF

        conducted the cross-check between the NICS Firearm Background Check and the

        Terrorist Screening Database using unconstitutional and illegal means.

24.     The initial cross-check of the NICS Firearms Background Check information is

        conducted on every single contact made to the ATF to pre-screen a potential

        customer of a firearm, even though there is no statutory authority for the ATF to

        share this information with the FBI or the TSC for this purpose.

25.     Further, the FBI is actively conducting field operations against potential firearms

        customers to obtain the additional information found on the ATF Form 4473,

        including the firearm manufacturer, model, and serial number.

26.     The FBI trains its field agents to obtain confidential, personal information from the

        ATF Form 4473 from FFL dealers and, that when the FBI field agent is unable to

        gain access to these paper forms at the FFL dealer, to bring in the ATF field agent

        to procure such information.

27.   The FBI, in conjunction with the ATF, makes affirmative misrepresentations to
      FFL dealers about the examination and taking off premises of the original paper
      versions of the ATF Form 4473 and, in all reasonable probability, about its access
      to and use of the FFL dealer permanent inventory records of acquisition and
      disposition of firearms.

28.   The FBI, in conjunction with the ATF, has been compiling and retaining
      confidential customer information, including manufacturer, model, and serial
      number of potential firearms purchases.

29.   The FBI republishes the confidential, personal information from the NICS
      Firearms Background Check data to numerous other agencies, foreign
      governments, and private contractors in direct violation of federal law.

30.   The TSC provides reports that contain information taken from the NICS Firearms
      Background Check to federal, state, and local offices and agencies, including in
      electronic format, across multiple platforms in direct violation of federal law.

31.   It is unknown what happens to the confidential, personal information provided by
      individuals on the ATF Form 4473 after it is released by the FBI to other
      government offices and agencies, foreign governments, and private contractors,
      and whether that information is ever destroyed.

32.   No individual has been notified that the information provided upon or the storage
      of the ATF Form 4473 was being used in every instance to both cross-check the

customer against the Terrorist Screening Database and to circulate the personal information to the FBI and all members of the "intelligence community," including, but not limited to, foreign governments and private contractors.

33.   When the FBI believes that a potential customer is a match to someone in the Terrorist Screening Database, rather than provide notice to the potential customer, the FBI uses the "delay" sequence through the ATF to create a three business-day window to elicit further information about the potential customer, including, but not limited to, learning the manufacturer, model, and serial number of the potential firearm to be purchased.

34.   There are three potential outcomes in response to the initial submission of limited information on the potential customer from the FFL dealer via telephone: (1.) "proceed," which is meant to indicate that there is an absence of a federal disqualifying factor that would otherwise result in a denial of the background check; (2.) "deny," which is meant to indicate that the person suffers from one or more federal disqualifying factors; or, (3.) "delay," which is meant to create a three business day window to allow for additional investigation of a potential customer, to clarify an uploaded record.

35.   The original language of the "Brady Act" included only two outcomes:  "proceed" and "deny."  The FBI created the "delay" sequence under the claim that "The law does not prohibit the system from making such a response" and that it was "merely

a way of communicating to the FFL that the system requires additional time to research and evaluate whether the prospective transferee is disqualified from receiving a firearm."[5]

## Defendants Have No Authority to Wage War on Gun Owners.

36.  The Attorney General, FBI, TSC, and ATF have engaged in illegal and unconstitutional behavior, abusing access to confidential, personal information of gun owners under a smoke and mirrors show to the American public that they called "audits" and "national security."

37.  No President of the United States has issued a directive that called for the end of fundamental rights under the Second Amendment or to the violation of the civil liberties of American gun owners.

38.  The conduct of the Attorneys General, the FBI, the TSC, and the ATF amount to a perversion of the "War on Terror" to a "War on Gun Owners."

39.  On September 16, 2003, President George W. Bush signed the "Homeland Security Presidential Directive" (HSPD-6), which simply stated that "to the full extent permitted by law," agencies should "develop, integrate, and maintain thorough, accurate, and current information about individuals known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism (Terrorist Information)."

---

[5] Federal Register, Vol. 63, No. 210 (October 30, 1998), *supra*, p. 58305.

40.   HSPD-6 called for the Attorney General to establish an organization to consolidate the government's "approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes."

41.   HSPD-6 clearly states "This directive shall be implemented in a manner consistent with the provisions of the Constitution and applicable laws, including those protecting the rights of all Americans."

42.   The federal government is expressly barred from creating a national firearms registry.

43.   The FBI publicly affirmed as early as October 30, 1998:  "The FBI will not establish a federal firearms registry.  The FBI is expressly barred from doing so by section 103(i) of the Brady Act."[6, 7]

44.   The initial excuse offered by the FBI for its data grab of every NICS Firearms Background Check was its intention to create a "NICS Audit Log," to house and to retain data on each potential gun owner, including guarding against "identity theft" and "unauthorized use."

---

[6] Federal Register, Vol. 63, No. 210 (October 30, 1998), p. 58303.

[7] Pub.L. 103-159 (November 30, 1993), also known as the "Brady Handgun Violence Prevention Act, or, "Brady Act."

45.    The FBI began its drive to capture data on each potential gun owners as early as 1993, as soon as the "Brady Act" passed and five years before the NICS Firearms Background Check became fully operational on November 30, 1998.

46.    The FBI, the TSC, and the ATF have been repeatedly notified in writing by one or more former United States Attorney(s) General that agency conduct violated federal law, such notifications beginning as early as 2001.

47.    The FBI has acknowledged its awareness of federal restrictions against its intended and actual uses of the NICS Firearms Background Check data, but conducts itself as being above the law and the Constitution.  The TSC has not yet been called upon to account for its behavior in this regard.

48.    The Attorney General failed to put an end to the actions, programs, and systems of the FBI, TSC, and ATF that equate American gun owners with terrorists, even as such behavior became a written part of agency culture, training, and routine operations.

**Defendants Intentionally Mislead the Public in the Name of "National Security."**

49.    Neither the Attorney General nor the FBI use the cross-match information to stop the sale of a firearm on the basis of the information contained in the NICS Firearms Background Check, nor are they authorized to do so.

50.    Even though there has been proposed legislation for more than ten years, Congress has not enacted a "10th factor" to add to the nine current categories of disqualifying

events that result in permanent disqualification of an individual from ownership, use, and possession of a firearm.

51.    There is no redemption for the Defendants.  The behavior of the Defendants has not produced even a claim that such unconstitutional and illegal use of the NICS Firearms Background Check information has thwarted even one terrorist attack on U.S. soil.

52.    There has been no claim made by the Defendants that since February 2004 any one person who was a "match" to the cross-check has conducted terrorist activity with a legally purchased firearm.

53.    A 2013 Congressional Service Research Report speculated:  "**If** the older brother, Tamerlan [Tsarnaev], had acquired the firearm from a federally licensed gun dealer, then the federally required background check **may have** triggered a terrorist watchlist hit that, in turn, **would have possibly** prompted authorities – particularly the FBI-led Boston Joint Terrorist Task Force – to reopen a preliminary assessment that it had previously conducted on him based upon the March 2011 Russian FSB tip and apparently closed in June 2011."[8]  The problem with such speculation, leading with words "if" and "may have" and "would possibly have," is that the stretch is so tortured and premature that it does nothing other than contribute to stigma that law-abiding gun owners are terrorists.  In fact, only months after the

---

[8] Krouse, William J., "Terrorist Watch List Screening and Background Checks for Firearms," Congressional Research Service (May 1, 2013, 7-5700), p. 2 (emphasis added).

CRS Report, one Stephen Silva pled guilty to providing the handgun to Tamerlin, the last in a 3-year line of criminals illegally possessing the handgun, beginning with the first purchaser who was a straw man for a gang.[9]

54.   Most recently, the call for the "10[th] factor" being enacted relates to events in San Bernadino, California, wherein the firearms were likewise acquired from one Enrique Marquez, who has already been charged with, *inter alia*, committing a criminal "straw purchase" by making a false statement(s) on the ATF Form 4473 in connection with the purchase of firearms.  There is no allegation in the 37-page federal Criminal Complaint that either this individual or either of the two terrorists was on any terrorist watch list at the time the individual purchased the rifles in 2011 and 2012.[10]  "Specifically, MARQUEZ admitted that he would purchase the firearms because his appearance was Caucasian, while Farook looked Middle-Eastern."[11]

55.   Terrorist attacks on U.S. soil against U.S. citizens have been undertaken since the 1993 World Trade Center bombing by persons who obtained visas for legal entry into the U.S. or were American citizens, by persons who took private pilot lessons, rented cars, bought ammonium nitrate, and otherwise engaged in various activities with the permission and oversight of various agencies of the federal government.

---

[9] Wen, Patricia, "Tsarnaev friend pleads guilty to heroin, gun charges," Boston Globe (December 19, 2014).

[10] *United States v. Enrique Marquez, Jr.*, Criminal Complaint (duly sworn December 17, 2015, CACD, 5:15MJ498).

[11] *Id.*, ¶39, p. 12.

56.     There is no data to support the singular focus of the Defendants upon firearms and firearms customers and owners as the focal point for mass screening in the name of terrorist activities and threats in America.  The Defendants are engaged in the illegal and unconstitutional use of data available through the NICS Firearms Background Check because it is easy for them to capture and manipulate, even though they are aware that such conduct is both illegal, unconstitutional, and ineffective.

57.     The Attorney General, the FBI, the TSC, and the ATF have failed to obtain statutory and regulatory sanction for their unconstitutional and illegal behavior for more than ten years because their actions and activities violate the civil liberties of every American under the Second Amendment, the Fourth Amendment, the Fifth Amendment, the Fourteenth Amendment, and to privacy.

## Defendants are Positioned to Knock on the Door of Most Gun Owners in America.

58.     No person is known to have been notified of being nominated to and/or added to the Terrorist Screening Database.

59.     No person is known to have been notified that the Attorney General, the FBI, or the TSC has come into possession of confidential, personal information about a potential gun owner, including the manufacturer, model, and serial number of the firearm listed by the FFL dealer upon the ATF Form 4473 form.

60.   There is no process through which a person can find out whether s/he is listed in the Terrorist Screening Database, even if the processing of their NICS Firearms Background Check is delayed or denied.

61.   The ATF appeals process for a potential customer at an FFL dealer that is "denied" does not include any process or remedy related to the Terrorist Screening Database.

62.   There is no process through which a person can have their name removed from the Terrorist Screening Database.

63.   There is no process through which a person can have an error in data be corrected pertaining to the Terrorist Screening Database.

64.   Depending on what commentator one selects, the "process" for adding someone into the Terrorist Screening Database appears to amount to no more than a simple nomination of someone "known," "reasonably suspected," or "appropriately suspected" of having possible links to terrorism in addition to individuals with known links, with no requirement of independent verification or corroboration. Subsets and feeders into the Terrorist Screening Database appear to function under other and different standards, which, for example, in the case of the Transportation Security Administration "No Fly" list runs as low as being deemed "a threat."

65.   Any American can end up in the Terrorist Screening Database, regardless whether a high profile individual, a licensed professional, a political party member, or a nonviolent protester for a civil rights cause.

66.   Among those believed to be on the "no fly list," a subset of the Terrorist Screening Database, are U.S. Senator Ted Kennedy,[12] U.S. Representative John Lewis,[13] conservative journalist Stephen F. Hayes,[14] and ACLU Attorney David Fathi[15].

67.   Among the reports of those put onto the Terrorist Screening Database were 53 activists against the death penalty who were entered "into state and federal databases that track terrorism suspects," through the Maryland State Police because they were thought to be "fringe people."[16]

68.   The official position of the FBI and the TSC is that there will be neither a confirmation nor a denial that an individual is in the Terrorist Screening Database.

69.   The Attorney General, the FBI, the TSC, and the ATF, through their actions, both unconstitutional and illegal, are positioned to knock on the door of an unsuspecting and law-abiding American gun owner with the intention of confiscation of firearms derived from the ATF Form 4473 that may previously have been submitted by the individual, even if he did not complete the purchase of the firearm.

---

[12] Goo, Sara Kehaulani, "Sen. Kennedy Flagged by No-Fly List," The Washington Post (August 20, 2004).

[13] Barrett, Ted, "Kennedy has company on airline watch list," The Washington Post (August 20, 2004).

[14] Rather, Arun, "All Things Considered: How a Journalist Ended up on a Terror Watch List," NPR (September 28, 2014, interview of Stephen F. Hayes).

[15] "Statement of David C. Fathi," at https://www.aclu.org/statement-david-c-fathi.

[16] Rein, Lisa, "Maryland Police Put Activists' Names on Terror Lists," The Washington Post (October 8, 2008).

70. The Second Amendment right to keep and bear arms is a fundamental right of the highest order.

71. The Second Amendment is the ultimate bullwork against government tyranny.

72. We have reached a point in the political dynamic where "9/11" represents both the fall of the Twin Towers and the collapse of civil liberties.

## THE PLAINTIFFS.

73. The Plaintiffs ardently believe in the critical necessity of the written words of the Second Amendment of the United States Constitution, as an expression and codification of the natural rights of man.

74. The Plaintiffs are outspoken critics against government infringement of Second Amendment and additional civil liberties.

75. The Plaintiffs consistently invoke their First Amendment rights of free speech and assembly with calls to activism and protest, political education, preparedness, and situational awareness.

76. The Plaintiffs share a true and strong belief in the potential that tyranny can occur in a government of men, and that power, if left unchecked, will be abused.

77.    The Plaintiffs are critical of all established political parties and the lack of leadership in America in the post-9/11 climate, and they speak publicly on national security issues and on international terrorism.

78.    The Plaintiffs are members in various formal and informal organizations that support and defend the Second Amendment, including, but not limited to the National Rifle Association, Gun Owners of America, the Second Amendment Foundation, the Shooters Committee on Political Education, the New York State Rifle and Pistol Association, Oathkeepers, New York Revolution, NY2A, and III%.

79.    The Plaintiffs are routinely subjected to false accusations, even to the point of several of the Plaintiffs being told that they are on government watch lists.

80.    Each of the Plaintiffs has completed an ATF Form 4473 since February 2004, and each wants to continue to purchase firearms through federally-licensed dealers.

81.    Not one of the Plaintiffs consented to have their confidential, personal information shared among the Defendants, shared among an "intelligence community," shared with foreign governments, shared with private contractors, or retained beyond statutory periods for destruction.

82.    All Plaintiffs are opposed to the practices of the federal offices and agencies identified within this Complaint.

83. The Plaintiffs are, at this point and based upon the information contained in this Complaint, being forced to choose between their Second Amendment rights, their First Amendment rights, and other, valuable civil liberties.

84. The Plaintiffs are being forced to commence this federal civil rights litigation because there is no alternative process through which they can shut down the unconstitutional and illegal practices described herein, gain access to all information retained about them, and create a meaningful process for all others to apply to obtain their own information.

85. The Plaintiffs are already under and reasonably expect that public pressure and stigma against them will increase as a result of this litigation, a factor that only makes their need for judicial intervention more critical.

86. The Plaintiffs are United States citizens with residences in New York, including within the Western District Court of New York, with the exception of Larry Pratt, who is also the Executive Director of Gun Ownership of America, with a nationwide membership of Second Amendment supporters and activists, including throughout and in Western New York.

### JURISDICTION AND VENUE.

87. The Defendants are being sued in their official capacities.

88.     This case arises under the Constitution and the laws of the United States, and it
        presents one or more federal questions within this Court's jurisdiction under
        Article III of the United States Constitution and 28 U.S.C. § 1331. This court has
        jurisdiction of this case under 42 U.S.C. §1983 in that this action seeks relief from
        the deprivation of rights, privileges, or immunities secured by the United States
        Constitution under color of statute, ordinance, regulation, custom, or useage. The
        Court also has jurisdiction under 5 U.S.C. §702 (the "Administrative Procedure
        Act").

89.     Venue lies in this District Court pursuant to 28 U.S.C. §1391(e).

90.     The Court has the authority to grant declaratory relief pursuant to 28 U.S.C.
        §§2201 – 2202 (the "Declaratory Judgment Act"), and 42 U.S.C. §1983.

91.     The Court has the authority to award attorney's fees and costs pursuant to
        28 U.S.C. §2412 and 42 U.S.C. §1988.


### CLAIMS FOR RELIEF:

## I. THE RIGHT TO KEEP AND BEAR ARMS.

92.     The preceding allegations are realleged and incorporated by reference as if fully set
        forth herein.

93.     The actions and omissions of the Defendants are calculated to deprive the Plaintiffs
        of their fundamental rights under the Second Amendment of the United States

Constitution to keep and bear arms, and to otherwise chill them from exercising
those and other, valuable civil liberties.

94.     The conduct of the Defendants is contra-constitutional in that it is calculated to
destroy the essence of the Second Amendment of the United States Constitution
and the spirit of those who would support and exercise it, in order that this last line
of defense for the Bill of Rights would fall as surely as have other of the Plaintiffs'
civil liberties.

## II. THE RIGHT TO ENJOY THE DUE PROCESS OF LAW.

95.     The preceding allegations are realleged and incorporated by reference as if fully set
forth herein.

96.     The actions and omissions of the Defendants through the illegal use of confidential,
personal information provided by the Plaintiffs through the NICS Firearms
Background Check as posited against the Terrorist Screening Database have
deprived the Plaintiffs of their right under the Fifth Amendment of the United
States Constitution to enjoy the due process of law

## III. THE RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES.

97.     The preceding allegations are realleged and incorporated by reference as if fully set
forth herein.

98.  The actions and omissions of the Defendants through the illegal use of confidential,

personal information provided by the Plaintiffs through the NICS Firearms

Background Check have deprived the Plaintiffs of their right to be free from

unreasonable searches and seizures in violation of the Fourth Amendment of the

United States Constitution.

## IV. THE RIGHT TO ENJOY THE EQUAL PROTECTION OF LAW AND BE FREE FROM DISCRIMINATION.

99.  The preceding allegations are realleged and incorporated by reference as if fully set

forth herein.

100.  The actions and omissions of the Defendants to target the Plaintiffs through the

NICS Firearms Background Check has discriminated against the Plaintiffs as

potential customers of firearms and resulted in their stigmatization as terrorists and

potential terrorists in violation of their rights under the Fourteenth Amendment of

the United States Constitution.

## V. THE RIGHT TO PRIVACY.

101.  The preceding allegations are realleged and incorporated by reference as if fully set

forth herein.

102.  The actions and omissions of the Defendants through the illegal dissemination of

confidential, personal information provided by the Plaintiffs through the NICS

Firearms Background Check throughout various, unauthorized offices and agencies

of the federal government and to foreign governments and private contractors have

deprived the Plaintiffs of their right to privacy under the United States Constitution

and under federal law.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request the Court grant the following relief:

I.    A declaration that the Defendants' use of the NICS Firearms Background Check data in conjunction with the Terrorist Screening Database is unconstitutional under the Second Amendment, the Fourth Amendment Search and Seizure Clause, the Fifth Amendment Due Process Clause, the Fourteenth Amendment Equal Protection Clause, and privacy rights, generally, and is otherwise illegal under federal law;

II.   A preliminary and then a permanent injunction enjoining the Defendants, their officers, agents, and employees from the use of any and all information captured during the NICS Firearms Background Check to use in conjunction with any and all databases that can be referred to or are under the aegis of the "Terrorist Screening Database" of the Terrorist Screening Center to cross-check whether a potential firearms customer is also an alleged "terrorist;"

III.  An order that the Defendants are required to immediately release personal information to each Plaintiff of which the Defendants are in possession concerning each Plaintiff's ATF Form 4473, each Plaintiff's potential firearms purchase, each Plaintiff's firearms transaction, each Plaintiff's database listing, including, but not limited to that which may be contained in the "Terrorist Screening Database;"

IV.   An order that the Defendants be required to immediately transmit written notification to every person who has submitted to a NICS Firearms Background

Check since February 2004 that they were subjected to an unauthorized background check through the Terrorist Screening Center and against the "Terrorist Screening Database," including in such written notification the process through which the potential firearms customer can request a copy of all of his or her personal information, identical to that which will be released to the Plaintiffs through this lawsuit;

V.   An order directing the Defendants purge all electronic and any paper records collected since February 2004 relating to the NICS Firearms Background Check, excepting those specified transactions that include the instance of a denial of a firearm purchase due to the existence of a confirmed, federal disqualifying event, as delineated under 18 U.S.C. §922(g)(1)-(9);

VI.   An award of monetary damages, including punitive damages, to the Plaintiff pursuant to 42 U.S.C. §1983;

VII.   An award of attorney's fees and costs to the Counsel for the Plaintiff pursuant to 28 U.S.C. §2412 and/or 42 U.S.C. §1988; and,

VIII.   An award such other, further, and different relief as to the Court is just.

Dated:   December 22, 2015
         Webster, New York

By:   *Paloma A. Capanna*
      Paloma A. Capanna, Attorney
      633 Lake Road
      Webster, New York 14580
      (585) 377-7260
      paloma@law-policy.com