IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Rochester Division

---

**LARRY PRATT, William Robinson,
Stephen J. Aldstadt, David Bardascini,
Michael P. Carpinelli, George Curbelo, Jr.,
Wayne Denn, William R. Fox, Sr.,
Tim Flaherty, Don Hey, Garry Edward Hoffman,
Raymond Kosorek, Michael R. Kubow,
Thomas J. Lorey, Thomas A. Marotta,
Michael Mastrogiovanni, Kenneth E. Mathison,
Terrence J. McCulley, Doug Negley, Jim Nowotny,
Jacob Palmateer, John E. Prendergast,
Harold W. Schroeder, Edward J. Stokes,
John W. Wallace, Leslie H. Wilson,
Christopher S. Zaleski, Mattie D. Zarpentine,
Gun Owners of America, Shooters Committee
for Political Education, New York Revolution,
Gun Rights Across America – New York,
NY2A.org, Fulton County NY Oath Keepers,**
*and all those other individuals who are
similarly situated,*

        Plaintiffs

    *vs.*

**LORETTA LYNCH,** Attorney General
of the United States of America, in her official
and individual capacities, **James B. Comey,** Director
of the Federal Bureau of Investigation, in his official
and individual capacities, **Christopher M. Piehota,**
Director of the Terrorist Screening Center,
in his official and individual capacities,
and **Thomas E. Brandon,** Acting Director of the
Bureau of Alcohol, Tobacco, Firearms
and Explosives, in his official and individual capacities,

        Defendants.

**AMENDED COMPLAINT**

**CLASS ACTION**

Civil No.:  6:15-cv-6765-FPG

---

## AMENDED COMPLAINT

### (For Declaratory Judgment and Injunctive Relief)

Plaintiffs, as individuals, do hereby, through their attorney, allege against Defendants Loretta Lynch, Attorney General of the United States of America, James B. Comey, Director of the Federal Bureau of Investigation, Christopher M. Piehota, Director of the Terrorist Screening Center, and Thomas E. Brandon, Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, as follows:

## Defendants' Use of Confidential Information on Gun Owners is Illegal.

1. All Americans have a fundamental right to own, possess, and transfer firearms, including for a range of purposes from sporting to self-defense of the home and family. The federal government has enacted nine, specific categories of persons who, through their actions and omissions and after a rigorous legal course, can be deemed to have forfeited their privileges under the Second Amendment of the United States Constitution.[1] Being a named person on a "terrorist watch list" is not a federal statutory disqualifying factor, nor should it be. Permanent deprivation of a fundamental civil right cannot and should not occur because something as small as an alleged, anonymous tip places an individual in a secret database managed by the Attorney General, the FBI, and/or the TSC to which the individual has no right of access and no method of recourse.

---

[1] See: 18 U.S.C. §922(g)(1)-(9).

2.    In order to exercise their fundamental rights under the Second Amendment, potential purchasers of firearms are subjected to a pre-purchase background check known as the "NICS Firearms Background Check," which compares the customer's identifying information against records associated with the federal disqualifying factors, such as being an illegal alien or having a felony conviction.

3.    The legal spirit of the statutes and associated regulations of the NICS Firearms Background Check is unusual in that the design places strong and clear limitations on the government's access to, retention of, and use of the personal information supplied by the potential customer of a firearm.

4.    The essential design of the NICS Firearms Background Check creates a tight relationship between the customer (an individual), the store (which is a private business), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF").  Information transmission is under highly specific circumstances, including that the ATF should be bringing the disqualifying information into its data realm, not be publishing information outward to the general community of offices and agencies under the auspices of the Attorney General.

5.    The NICS Firearms Background Check relies upon information voluntarily supplied by a potential customer of a firearm to a federally-licensed dealer (hereafter, "FFL dealer") upon a form titled "ATF Form 4473."

6.     The personal information supplied by the customer on the ATF Form 4473 is

confidential, as a matter of law, and the ATF widely publicizes the restrictions

upon and penalties associated with misuse of this information in order to entice

potential gun buyers to conduct their firearms transactions through an FFL dealer.

7.     The ATF makes legally accurate, affirmative representations to customers and

FFLs that the limited information submitted from the ATF Form 4473 to the ATF

through the FFL is confidential to the FFL dealer and to the ATF, that no database

will be amassed nor registry created, that the information will be promptly purged,

and that only in very limited and specific criminal investigation circumstances will

any additional information from the ATF Form 4473 be transmitted to the

minimum law enforcement offices necessary to apprehend the alleged criminal or

to trace the recovered stolen firearm.

8.     No individual consents to a waiver of privacy through the completion of the
ATF Form 4473.

9.     No individual consents to the retention of their personal information and their

potential firearms purchase information through the completion of the

ATF Form 4473.

10.    The ATF Form 4473 is a physical piece of paper.[2]

---

[2] The ATF did begin an electronic filing system for the ATF Form 4473, the same remains optional to the FFL
dealer.

11.   It is the private FFL dealer – and not the federal government – that acts as the
repository for and guardian of the ATF Form 4473.

12.   The FFL dealer is required to retain the ATF Form 4473 for a period of
twenty years.[3]  And, if and when the FFL dealer terminates operations, it must
transmit these and other original records to the ATF repository.

13.   The NICS Firearms Background Check takes place in two parts.  First, the FFL
dealer contacts the ATF to provide partial data from the ATF Form 4473, limited to
the name, date of birth, gender, race, state of residence, and (if provided) Social
Security Number of the potential customer.  The rest of the information on the
form and the photographic identification provided is not transmitted to the ATF.
Additional information that goes onto the ATF Form 4473 that is not transmitted in
the initial ATF contact includes the manufacturer, model, and serial number of the
firearm that may be purchased if the customer does not fail the background check.

14.   There are only three instances at law through which the ATF would gain access to
the paper version of the ATF Form 4473 and, thus, the balance of the additional,
available information:  (1.) during a routine audit, conducted no more than once per
12-month period; (2.) after an FFL dealer has ceased operations and performed the
mandatory submission of certain, enumerated records to the ATF permanent
repository; and, (3.) as part of a criminal investigation.

---

[3] If a sale is not completed, the FFL dealer obligation for retention of the ATF Form 4473 is only five years.

15.     No person is required to complete a purchase of a firearm, even if the background check is negative for any disqualifying factor.

16.     No FFL dealer is required to complete a firearms sale, for any reason, even if the potential customer has a negative background check.

17.     There is no expectation that any information supplied by the potential customer through the FFL dealer will be used by the federal government for any purpose other than a specific background check against the nine categories of federal disqualifying factors.

**Defendants Treat Every Potential Gun Owner Like a Terrorist.**

18.     On November 30, 1998, the ATF NICS Firearms Background Check became available on a nationwide basis (hereafter "NICS launch date").

19.     Without any legal authority to do so, since at least February 2004, the Federal Bureau of Investigation (the "FBI") has carried out a fully-operational cross-check system between the NICS Firearms Background Check and the "Terrorist Screening Database."[4]

20.     From November 30 1998 through November 30, 2015, a total of 222,363,898 NICS Firearm Background Checks were conducted by the ATF.

---

[4] For purposes of this pleading, the term "Terrorist Screening Database" is used to collectively represent the current database name and all predecessor and feeder databases. The "Terrorist Screening Database" is also commonly referred to as the "Terrorist Watchlist," as acknowledged by the Terrorist Screening Center.

21.  Continuously since on or after February 2004, the FBI, TSC, and ATF ran every NICS Firearms Background Check against the Terrorist Screening Database, without the legal authority to do so and in direct violation of federal law.

22.  As of December 31, 2014, the FBI alleges that 2,233 persons, or, 0.001% of the total persons processed through the NICS Firearm Background Check were also cross-listed in the "Terrorist Screening Database."

23.  The Terrorist Screening Center ("TSC") in conjunction with the FBI and the ATF conducted the cross-check between the NICS Firearm Background Check and the Terrorist Screening Database using unconstitutional and illegal means.

24.  The initial cross-check of the NICS Firearms Background Check information is conducted on every single contact made to the ATF to pre-screen a potential customer of a firearm, even though there is no statutory authority for the ATF to share this information with the FBI or the TSC for this purpose.

25.  Further, the FBI is actively conducting field operations against potential firearms customers to obtain the additional information found on the ATF Form 4473, including the firearm manufacturer, model, and serial number.

26.  The FBI trains its field agents to obtain confidential, personal information from the ATF Form 4473 from FFL dealers and, that when the FBI field agent is unable to gain access to these paper forms at the FFL dealer, to bring in the ATF field agent to procure such information.

27.    The FBI, in conjunction with the ATF, makes affirmative misrepresentations to FFL dealers about the examination on site and the taking off premises of the original paper versions of the ATF Form 4473 and, in all reasonable probability, about its access to and use of the FFL dealer permanent inventory records of acquisition and disposition of firearms.

28.    The FBI, in conjunction with the ATF, has been compiling and retaining confidential customer information, including manufacturer, model, and serial number of potential firearms purchases.

29.    The FBI republishes the confidential, personal information from the NICS Firearms Background Check data to numerous other agencies, foreign governments, and private contractors in direct violation of federal law.

30.    The TSC provides reports that contain information taken from the NICS Firearms Background Check to federal, state, and local offices and agencies, including in electronic format, across multiple platforms in direct violation of federal law.

31.    It is unknown what happens to the confidential, personal information provided by individuals on the ATF Form 4473 after it is released by the FBI to other government offices and agencies, foreign governments, and private contractors, and whether that information is ever destroyed.

32.    No individual has been notified that the information provided upon or the storage of the ATF Form 4473 was being used in every instance to both cross-check the

customer against the Terrorist Screening Database and to circulate the personal

information to the FBI and all members of the "intelligence community,"

including, but not limited to, foreign governments and private contractors.

33.   When the FBI believes that a potential customer is a match to someone in the

Terrorist Screening Database, rather than provide notice to the potential customer,

the FBI uses the "delay" sequence through the ATF to create a three business-day

window to elicit further information about the potential customer, including, but

not limited to, learning the manufacturer, model, and serial number of the potential

firearm to be purchased.

34.   There are three potential outcomes in response to the initial submission of limited

information on the potential customer from the FFL dealer via telephone:

(1.) "proceed," which is meant to indicate that there is an absence of a federal

disqualifying factor that would otherwise result in a denial of the background

check; (2.) "deny," which is meant to indicate that the person suffers from one or

more federal disqualifying factors; or, (3.) "delay," which is meant to create a three

business day window to allow for additional investigation of a potential customer,

to clarify an uploaded record.

35.   The original language of the "Brady Act" included only two outcomes: "proceed"

and "deny." The FBI created the "delay" sequence under the claim that "The law

does not prohibit the system from making such a response" and that it was "merely

a way of communicating to the FFL that the system requires additional time to research and evaluate whether the prospective transferee is disqualified from receiving a firearm."[5]

## Defendants Have No Authority to Wage War on Gun Owners.

36.   The Attorney General, FBI, TSC, and ATF have engaged in illegal and unconstitutional behavior, abusing access to confidential, personal information of gun owners under a smoke and mirrors show to the American public that they called "audits" and "national security."

37.   No President of the United States has issued a directive that called for the end of fundamental rights under the Second Amendment or to the violation of the civil liberties of American gun owners.

38.   The conduct of the Attorneys General, the FBI, the TSC, and the ATF amount to a perversion of the "War on Terror" to a "War on Gun Owners."

39.   On September 16, 2003, President George W. Bush signed the "Homeland Security Presidential Directive" (HSPD-6), which simply stated that "to the full extent permitted by law," agencies should "develop, integrate, and maintain thorough, accurate, and current information about individuals known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism (Terrorist Information)."

---

[5] Federal Register, Vol. 63, No. 210 (October 30, 1998), *supra,* p. 58305.

40.   HSPD-6 called for the Attorney General to establish an organization to consolidate the government's "approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes."

41.   HSPD-6 clearly states "This directive shall be implemented in a manner consistent with the provisions of the Constitution and applicable laws, including those protecting the rights of all Americans."

42.   The federal government is expressly barred from creating a national firearms registry.

43.   The FBI publicly affirmed as early as October 30, 1998: "The FBI will not establish a federal firearms registry. The FBI is expressly barred from doing so by section 103(i) of the Brady Act."[6, 7]

44.   The initial excuse offered by the FBI for its data grab of every NICS Firearms Background Check was its intention to create a "NICS Audit Log," to house and to retain data on each potential gun owner, including guarding against "identity theft" and "unauthorized use."

---

[6] Federal Register, Vol. 63, No. 210 (October 30, 1998), p. 58303.

[7] Pub.L. 103-159 (November 30, 1993), also known as the "Brady Handgun Violence Prevention Act, or, "Brady Act."

45.     The FBI began its drive to capture data on each potential gun owners as early as 1993, as soon as the "Brady Act" passed and five years before the NICS Firearms Background Check became fully operational on November 30, 1998.

46.     The FBI, the TSC, and the ATF have been repeatedly notified in writing by one or more former United States Attorney(s) General that agency conduct violated federal law, such notifications beginning as early as 2001.

47.     The FBI has acknowledged its awareness of federal restrictions against its intended and actual uses of the NICS Firearms Background Check data, but conducts itself as being above the law and the Constitution.  The TSC has not yet been called upon to account for its behavior in this regard.

48.     The Attorney General failed to put an end to the actions, programs, and systems of the FBI, TSC, and ATF that equate American gun owners with terrorists, even as such behavior became a written part of agency culture, training, and routine operations.

**Defendants Intentionally Mislead the Public in the Name of "National Security."**

49.     Neither the Attorney General nor the FBI use the cross-match information to stop the sale of a firearm on the basis of the information contained in the NICS Firearms Background Check, nor are they authorized to do so.

50.     Even though there has been proposed legislation for more than ten years, Congress has not enacted a "10th factor" to add to the nine current categories of disqualifying

events that result in permanent disqualification of an individual from ownership, use, and possession of a firearm.

51.   There is no redemption for the Defendants.  The behavior of the Defendants has not produced even a claim that such unconstitutional and illegal use of the NICS Firearms Background Check information has thwarted even one terrorist attack on U.S. soil.

52.   There has been no claim made by the Defendants that since February 2004 any one person who was a "match" to the cross-check has conducted terrorist activity with a legally purchased firearm.

53.   A 2013 Congressional Service Research Report speculated:  "**If** the older brother, Tamerlan [Tsarnaev], had acquired the firearm from a federally licensed gun dealer, then the federally required background check **may have** triggered a terrorist watchlist hit that, in turn, **would have possibly** prompted authorities – particularly the FBI-led Boston Joint Terrorist Task Force – to reopen a preliminary assessment that it had previously conducted on him based upon the March 2011 Russian FSB tip and apparently closed in June 2011."[8]  The problem with such speculation, leading with words "if" and "may have" and "would possibly have," is that the stretch is so tortured and premature that it does nothing other than contribute to stigma that law-abiding gun owners are terrorists.  In fact, only months after the

---

[8] Krouse, William J., "Terrorist Watch List Screening and Background Checks for Firearms," Congressional Research Service (May 1, 2013, 7-5700), p. 2 (emphasis added).

CRS Report, one Stephen Silva pled guilty to providing the handgun to Tamerlin, the last in a 3-year line of criminals illegally possessing the handgun, beginning with the first purchaser who was a straw man for a gang.[9]

54.   Most recently, the call for the "10[th] factor" being enacted relates to events in San Bernardino, California, wherein the firearms were likewise acquired from one Enrique Marquez, who has already been charged with, *inter alia*, committing a criminal "straw purchase" by making a false statement(s) on the ATF Form 4473 in connection with the purchase of firearms.  There is no allegation in the 37-page federal Criminal Complaint that either this individual or either of the two terrorists was on any terrorist watch list at the time the individual purchased the rifles in 2011 and 2012.[10]  "Specifically, MARQUEZ admitted that he would purchase the firearms because his appearance was Caucasian, while Farook looked Middle-Eastern."[11]

55.   Terrorist attacks on U.S. soil against U.S. citizens have been undertaken since the 1993 World Trade Center bombing by persons who obtained visas for legal entry into the U.S. or were American citizens, by persons who took private pilot lessons, rented cars, bought ammonium nitrate, and otherwise engaged in various activities with the permission and oversight of various agencies of the federal government.

---

[9] Wen, Patricia, "Tsarnaev friend pleads guilty to heroin, gun charges," Boston Globe (December 19, 2014).

[10] *United States v. Enrique Marquez, Jr.,* Criminal Complaint (duly sworn December 17, 2015, CACD, 5:15MJ498).

[11] *Id.,* ¶39, p. 12.

56.     There is no data to support the singular focus of the Defendants upon firearms and firearms customers and owners as the focal point for mass screening in the name of terrorist activities and threats in America. The Defendants are engaged in the illegal and unconstitutional use of data available through the NICS Firearms Background Check because it is easy for them to capture and manipulate, even though they are aware that such conduct is illegal, unconstitutional, and ineffective.

57.     The Attorney General, the FBI, the TSC, and the ATF have failed to obtain statutory and regulatory sanction for their unconstitutional and illegal behavior for more than ten years because their actions and activities violate the civil liberties of every American under the Second Amendment, the Fourth Amendment, the Fifth Amendment, the Fourteenth Amendment, and to privacy.

**Defendants are Positioned to Knock on the Door of Most Gun Owners in America.**

58.     No person is known to have been notified of being nominated to and/or added to the Terrorist Screening Database.

59.     No person is known to have been notified that the Attorney General, the FBI, or the TSC has come into possession of confidential, personal information about a potential gun owner, including the manufacturer, model, and serial number of the firearm listed by the FFL dealer upon the ATF Form 4473 form.

60.   There is no process through which a person can find out whether s/he is listed in the Terrorist Screening Database, even if the processing of their NICS Firearms Background Check is delayed or denied.

61.   The official position of the FBI and the TSC is that there will be neither a confirmation nor a denial that an individual is in the Terrorist Screening Database.

62.   The FBI has taken the official position that it will and can "neither confirm nor deny" that any information exists that would be responsive to Freedom of Information/Privacy Act requests submitted by various Plaintiffs, including a request for documentation that the individual is or ever has been included in one or more databases referred to as the "Terrorist Identities Database," "Terrorist Screening Database," "No Fly List," NICS Index," and/or the "NICS Audit Log," and documentation relating to the individual's submission of an "ATF Form 4473, including the manufacturer, model, and serial number from said form. (Please refer to the "Freedom of Information/Privacy Act Request" at Appendix A.)

63.   The ATF appeals process for a potential customer at an FFL dealer that is "denied" does not include any process or remedy related to the Terrorist Screening Database.

64.   There is no process through which a person can have their name removed from the Terrorist Screening Database.

65.   There is no process through which a person can have an error in data be corrected pertaining to the Terrorist Screening Database.

66.  Depending on what commentator one selects, the "process" for adding someone into the Terrorist Screening Database appears to amount to no more than a simple nomination of someone "known," "reasonably suspected," or "appropriately suspected" of having possible links to terrorism in addition to individuals with known links, with no requirement of independent verification or corroboration. Subsets and feeders into the Terrorist Screening Database appear to function under other and different standards, which, for example, in the case of the Transportation Security Administration "No Fly" list runs as low as being deemed "a threat."

67.  Any American can end up in the Terrorist Screening Database, regardless whether a high profile individual, a licensed professional, a political party member, or a nonviolent protester for a civil rights cause.

68.  Among those believed to be on the "no fly list," a subset of the Terrorist Screening Database, are U.S. Senator Ted Kennedy,[12] U.S. Representative John Lewis,[13] conservative journalist Stephen F. Hayes,[14] and ACLU Attorney David Fathi[15].

69.  Among the reports of those put onto the Terrorist Screening Database were 53 activists against the death penalty who were entered "into state and federal

---

[12] Goo, Sara Kehaulani, "Sen. Kennedy Flagged by No-Fly List," The Washington Post (August 20, 2004).

[13] Barrett, Ted, "Kennedy has company on airline watch list," The Washington Post (August 20, 2004).

[14] Rather, Arun, "All Things Considered:  How a Journalist Ended up on a Terror Watch List," NPR (September 28, 2014, interview of Stephen F. Hayes).

[15] "Statement of David C. Fathi," at https://www.aclu.org/statement-david-c-fathi.

databases that track terrorism suspects," through the Maryland State Police because they were thought to be "fringe people."[16]

70.    The Attorney General, the FBI, the TSC, and the ATF, through their actions, both unconstitutional and illegal, are positioned to knock on the door of an unsuspecting and law-abiding American gun owner with the intention of confiscation of firearms derived from the ATF Form 4473 that may previously have been submitted by the individual, even if he did not complete the purchase of the firearm.

71.    The Second Amendment right to keep and bear arms is a fundamental right of the highest order.

72.    The Second Amendment is the ultimate bulwark against government tyranny.

73.    We have reached a point in the political dynamic where "9/11" represents both the fall of the Twin Towers and the collapse of civil liberties.

## THE PLAINTIFFS.

74.    The Plaintiffs ardently believe in the critical necessity of the written words of the Second Amendment of the United States Constitution, as an expression and codification of the natural rights of man.

---

[16] Rein, Lisa, "Maryland Police Put Activists' Names on Terror Lists," The Washington Post (October 8, 2008).

75.  The Plaintiffs are outspoken critics against government infringement of Second Amendment and additional civil liberties.

76.  The Plaintiffs consistently invoke their First Amendment rights of free speech and assembly with calls to activism and protest, political education, preparedness, and situational awareness.

77.  The Plaintiffs share a true and strong belief in the potential that tyranny can occur in a government of men, and that power, if left unchecked, will be abused.

78.  The Plaintiffs are critical of all established political parties and the lack of leadership in America in the post-9/11 climate, and they speak publicly on national security issues and on international terrorism.

79.  The Plaintiffs are members in various formal and informal organizations that support and defend the Second Amendment, including, but not limited to the National Rifle Association, Gun Owners of America, the Second Amendment Foundation, the Shooters Committee on Political Education, the New York State Rifle and Pistol Association, Oathkeepers, New York Revolution, and NY2A.org.

80.  The Plaintiffs are routinely subjected to false accusations, even to the point of several of the Plaintiffs being told that they are on government watch lists.

81.  Each of the Plaintiffs has completed an ATF Form 4473 since February 2004, and each wants to continue to purchase firearms through federally-licensed dealers.

82.   Not one of the Plaintiffs consented to have their confidential, personal information shared among the Defendants, shared among an "intelligence community," shared with foreign governments, shared with private contractors, or retained beyond statutory periods for destruction.

83.   All Plaintiffs are opposed to the practices of the federal offices and agencies identified within this Amended Complaint.

84.   The Plaintiffs are, at this point and based upon the information contained in this Amended Complaint, being forced to choose between their Second Amendment rights, their First Amendment rights, and other, valuable civil liberties.

85.   The Plaintiffs are being forced to commence this federal civil rights litigation because there is no alternative process through which they can shut down the unconstitutional and illegal practices described herein, gain access to all information retained about them, and create a meaningful process for all others to apply to obtain their own information.

86.   The Plaintiffs are already under and reasonably expect that public pressure and stigma against them will increase as a result of this litigation, a factor that only makes more critical their need for judicial intervention.

87.   The Plaintiffs are United States citizens with residences in New York, including within the Western District Court of New York, with the exception of Larry Pratt, who is also the Executive Director of Gun Ownership of America, with a

nationwide membership of Second Amendment supporters and activists, including throughout and in Western New York.

88.   Gun Owners of America is a 501(c)(3) non-profit corporation, formed in 1975, to preserve and defend the Second Amendment rights of gun owners through grassroots lobbying efforts.  Gun Owners of America has more than 300,000 dues-paying members throughout the United States, including within the State of New York, and engages on a regular basis with more than 1.5 million gun owners.  GOA supports various lawsuits, including *Ryan S. Watson, Trustee, Watson Gun Trust v. Holder* (EDPA, 2:2014-cv-06569, on appeal to the Third Circuit Court of Appeals) and *Dennys Rodriguez v. United States,* 575 U.S. _____ (2015, Case No. 13-9972).  Plaintiff Larry Pratt is the Executive Director of this national organization.  Multiple of the Plaintiffs are members of Gun Owners of America.

89.   For more than 50 years, the Shooters Committee on Political Education has been a 501(c)(4) non-profit corporation, defending the civil rights of firearms owners, as guaranteed by the Second Amendment to the United States Constitution. SCOPE has more than 7,000 dues contributing members throughout the State of New York, actively engaged in monthly meetings in nearly every county, in public rallies and forums, at other legislative action events, and in public forums and publications.  SCOPE has been involved in numerous other legal challenges, including the creation of a 135 member coalition Amicus Brief to be filed to the

United States Supreme Court in *New York State Rifle and Pistol Association vs. Cuomo*. Plaintiff Stephen J. Aldstadt is President of this statewide organization. Several of the Plaintiffs are Board Members, Officers, and/or Chapter and Committee Chairs within SCOPE, including William R. Fox, Sr., Don Hey, Garry Edward Hoffman, Michael Mastrogiovanni, Kenneth E. Mathison, Doug Negley, Jim Nowotny, Harold W. Schroeder, and Leslie H. Wilson. Multiple of the Plaintiffs are members of SCOPE.

90.   Gun Rights Across America – New York was established as a grassroots organization to educate citizens and elected officials regarding the second amendment, gun rights, and firearms in order to preserve freedom and liberty in these United States. Members make the public aware of laws or regulations that infringe upon the right to bear arms, and shine a light on politicians who do not wholly support the Constitution of the United States. Plaintiff Tim Flaherty is the President of this nationwide organization's state chapter. Multiple of the Plaintiffs are members of Gun Rights Across America.

91.   New York Revolution is a grassroots organization with the purpose of waking up Americans to the reality of their civil liberties, and its members are committed to informing Americans of the deceit deteriorating their freedoms. New York Revolution believes that with this knowledge, Americans can and will become active patriots who restore the original purpose of the Constitution, thus ensuring our civil liberties and freedoms. Plaintiffs Tim Flaherty and George Curbelo were

founders of and Mattie Zarpentine and Wayne Denn now chair this statewide organization.  Multiple of the Plaintiffs are members of New York Revolution.

92.    NY2A.org is a grassroots civil rights organization engaged in voter education and issue advocacy.  Through its independent expenditure committee registered with the New York State Board of Elections, NY2A participates directly in the electoral process with its own campaign funding and expenditures that target key state legislative races in an effort to advance core principles in the Bill of Rights of the United States Constitution.  Plaintiffs Christopher S. Zaleski and Jacob Palmateer are two of the founders and organizers of this statewide activism group and independent expenditure committee.  Multiple of the Plaintiffs are participants in and donors to NY2A.org and its independent expenditure committee.

93.    Fulton County NY Oath Keepers is a non-partisan association of current and former military, veterans, peace officers, firefighters, and concerned citizens, who have reaffirmed their oath to support and defend the Constitution against all enemies, foreign and domestic, even if given unconstitutional or unlawful orders. The group is part of the national Oath Keepers association.  Plaintiff David Bardascini is the President of this chapter of the statewide organization, which is also part of a national organization.  Multiple of the Plaintiffs are members of Oath Keepers.

94.  Plaintiffs Michael P. Carpinelli and Thomas J. Lorey, are, respectively, the elected
     Sheriffs of Lewis County and of Fulton County.  Sheriff Lorey is only just retired.
     These Plaintiffs are also Second Amendment and civil rights activists who
     understand well the commitment made during the taking of the oath of office to
     uphold the United States Constitution, and who are conscious that they represent an
     often silent portion of duly elected officials and law enforcement officers who
     consider themselves unable to stand up and speak out for civil liberties for fear of
     retribution from the very government that they endeavor to serve.

## CLASS ACTION ALLEGATIONS.

95.  The Plaintiffs request the Court grant class action status pursuant to
     FRCP Rule 23(b)(1) and (3).

96.  The class is so numerous that joinder of all members is impracticable.  As alleged,
     above, more than 222 million transactions occurred between February 2004 and
     December 2015.  The Plaintiffs estimate that the class may consist of
     approximately 77.8 million discrete potential firearms customers, or, 35% of the
     total transactions.  This estimate is based upon, among other factors, the reasonable
     estimate that the average gun owner purchases a new or used firearm
     approximately every 3-4 years, that not all transactions are conducted through an
     FFL dealer, and that in only a few states are background checks at an FFL dealer
     required for a private sale of a used firearm.  It is further estimated that of the

77.8 million discrete potential firearms customers, that the class participation rate may be 25%, or, 19.45 million persons. The range of estimated participating class members could be as low as 4.85 million to as high as 19.45 million persons. The leading analytic factor for the upper end analysis is that a Second Amendment class action lawsuit will be a watershed process, violations of civil rights generate higher rates of class participation than other types of cases, the causes of action strike at the very foundation of the background check system as it has been marketed and sold by the federal government to the American people.

97.   There are questions of law or fact common to the class. There will be no differentiation between affected persons and the provisions of federal law governing the NICS Firearms Background system and other, associated provisions of law and regulation. The facts of the Defendants' illegal and unconstitutional behavior will not change from one potential customer to the next, with only the exception occurring if some person should receive actual confirmation from one of the Defendants of having been placed on the Terrorist Screening Database, an event which is rated as "highly improbable" to occur without a series of judicial orders being sought as relief in this case.

98.   The claims of the Plaintiffs are typical of the claims of the class. Persons eligible to participate in the class are all persons who completed an ATF Form 4473 between February 2004 and December 2015, who submitted the form to the FFL dealer, whose FFL dealer retained the paper form or otherwise made an electronic

data entry, and whose FFL dealer initiated contact with the ATF to request a background check.

99.  The representative parties will fairly and adequately protect the interests of the class. The individual Plaintiffs and the group and association Plaintiffs are leaders in their class of Second Amendment activists and organizations. They take very seriously the matters described in this Amended Complaint and the apparent violations of the civil liberties of so many Americans. The Plaintiffs are familiar with and work with each other on a daily basis, make joint appearances, work on joint publications and joint social media and other educational outreach. The Plaintiffs are public figures and are accountable, already, within the Second Amendment communities of New York and the United States.

100.  As concerns the requirements of FRCP Rule 23(b)(3), the class action approach is superior to other available methods for fairly and efficiently adjudicating the controversy. The class members have significant personal investments for decades and at expense to their families and jobs to defend the civil liberties enumerated in the Bill of Rights, generally, and in the Second Amendment, specifically. No one Plaintiff is out for personal gain, nor will any one Plaintiff be competitive against another. The Plaintiffs are jointly invested in defending the civil liberties of all Americans as a higher calling. No Plaintiff is a litigant in any other proceeding concerning the issues raised in this Amended Complaint. It is desirable to concentrate the litigation of nationwide claims in this particular forum due to the

excellence of the judicial resources in this Western District of New York,

Rochester Division, the ability of the Plaintiffs to be personally available for all

stages of the proceeding, and the network to which the Plaintiffs belong that will –

among other benefits – support the Plaintiffs through financial donations that will

be necessary to conduct this litigation.  This class action presents fewer difficulties

to establish and manage than most others, e.g., it does not involve medical records;

the class will be qualified through a simple series of questions and can be checked

by the Parties against the database maintained by the Defendants.


### THE DEFENDANTS.

101.  The Defendants are being sued in their official and individual capacities.

102.  Defendant Loretta Lynch is the Attorney General of the United States Department

of Justice, an agency of the federal government that is responsible, among other

things, "to ensure fair and impartial administration of justice for all Americans."[17]

Defendant Lynch was and remains responsible for oversight of the Federal Bureau

of Investigations, the Terrorist Screening Center, and the Bureau of Alcohol,

Tobacco, Firearms, and Explosives, including management of the "NICS Firearms

Background Check" and the "Terrorist Screening Database," as well as for making

proposals for such other, further, and different authority as may be desired to

---

[17] Website, United States Department of Justice, Home page, "Our Mission Statement" at
http://www.justice.gov/about.

implement program ideas, and for respecting limitations enacted by Congress, the President, and the Judiciary.  Defendant Lynch is sued in her official capacity and her individual capacity for acts and omissions that occurred in connection with duties performed on behalf of the United States.

103.   Defendant James B. Comey is the Director of the Federal Bureau of Investigation, an agency of the federal government that is responsible, among other things, to protect Americans "from the most dangerous threats facing our nation."[18] Defendant Comey was and is responsible for FBI data management, inter-agency relationships, including oversight of the Terrorist Screening Center, field agent training and oversight, and for awareness of and adherence to federal firearms statutes and regulations, including, but not limited to those directly and indirectly impacting the design, implementation, and limitations of the "NICS Firearms Background Check" system, the purpose and limitations of data collected from individuals and by FFL dealers, the purpose and limitations upon forms administered by the ATF such as those collected by and stored at FFL dealers, and of express federal prohibitions against the misuse of information collected through the "NICS Firearms Background Check" system, such as the express prohibition against the creation of a federal firearms registry.  Defendant Comey is sued in his official and his individual capacity for acts and omissions that occurred in connection with duties performed on behalf of the United States.

---

[18] Website, Federal Bureau of Investigation, About Us page at https://www.fbi.gov/about-us.

104.   Defendant Christopher M. Piehota is the Director of the Terrorist Screening Center,

an agency of the federal government that is responsible, among other things, to

maintain and operate the "Terrorist Screening Database" "in a manner consistent

with protecting privacy and civil liberties."[19]   Defendant Piehota is responsible for,

among other things, awareness of and adherence to federal firearms statutes and

regulations, including, but not limited to, statutory and regulatory restrictions on

the possession and use of information obtained through the "NICS Firearms

Background Check" system, deadlines for the destruction of such information, and

the express prohibition against the creation of a federal firearms registry.

Defendant Piehota is sued in his official and his individual capacity for acts and

omissions that occurred in connection with duties performed on behalf of the

United States.

105.   Defendant Thomas E. Brandon is the Acting Director of the Bureau of Alcohol,

Tobacco, Firearms, and Explosive Devices, an agency of the federal government

that is responsible, among other things, to "protect the public in a manner that is

faithful to the Constitution and the laws of the United States."[20]   Defendant

Brandon is responsible for, among other things, safeguarding the personal

information provided by potential purchasers of firearms during the "NICS

Firearms Background Check," ensuring the timely destruction of information,

---

[19] Website, Federal Bureau of Investigation, Terrorist Screening Center, Safeguarding Civil Liberties page at https://www.fbi.gov/about-us/nsb/tsc/tsc_liberties.

[20] Website, Bureau of Alcohol, Tobacco, Firearms and Explosives, Our Mission page at https://www.atf.gov/careers.

securing the information, restricting ATF field agents to the collection of additional information from the ATF Form 4473 to those situations enumerated at law and regulation, preventing the unauthorized access to and use of the information, limiting the use of the information to a cross-check against the federal disqualifying factors enumerated at 18 U.S.C. §922(g), designing and implementing a system for the appeal of denials that includes access to information in the possession and use of the agency that has impacted the ATF determination. Defendant Brandon is being sued in his official and his individual capacity for acts and omissions that occurred in connection with duties performed on behalf of the United States.

### JURISDICTION AND VENUE.

106.  This case arises under the Constitution and the laws of the United States, and it presents one or more federal questions within this Court's jurisdiction under Article III of the United States Constitution and 28 U.S.C. §1331. The Court also has jurisdiction under 5 U.S.C. §702 (the "Administrative Procedure Act").

107.  Venue lies in this District Court pursuant to 28 U.S.C. §1391(e)(1)(B) and (C).

108.  The Court has the authority to grant declaratory relief pursuant to 28 U.S.C. §§2201 – 2202 (the "Declaratory Judgment Act").

109. The Court has the authority to award damages against federal officials for constitutional torts committed by such officials while acting under color of federal authority pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

110. The Court has the authority to award attorney's fees and costs pursuant to 28 U.S.C. §2412.

## CLAIMS FOR RELIEF:

## I. THE RIGHT TO KEEP AND BEAR ARMS.

111. The preceding allegations are realleged and incorporated by reference as if fully set forth herein.

112. The actions and omissions of the Defendants are calculated to deprive the Plaintiffs of their fundamental rights under the Second Amendment of the United States Constitution to keep and bear arms, and to otherwise chill them from exercising those and other, valuable civil liberties.

113. The conduct of the Defendants is contra-constitutional in that it is calculated to destroy the essence of the Second Amendment of the United States Constitution and the spirit of those who would support and exercise it, in order that this last line of defense for the Bill of Rights would fall as surely as have other of the Plaintiffs' civil liberties.

114. The Defendants are targeting the Plaintiffs for exercising their rights to keep and bear arms, a fundamental right, guaranteed by the Second Amendment to the United States Constitution.

115. The Defendants' unlawful and unconstitutional actions caused the Plaintiffs harm and they are entitled to compensatory and punitive damages.

## II. THE RIGHT TO ENJOY THE DUE PROCESS OF LAW.

116. The preceding allegations are realleged and incorporated by reference as if fully set forth herein.

117. The actions and omissions of the Defendants through the illegal use of confidential, personal information provided by the Plaintiffs through the NICS Firearms Background Check as posited against the Terrorist Screening Database have deprived the Plaintiffs of their right under the Fifth Amendment of the United States Constitution to enjoy the due process of law

118. The Defendants are targeting the Plaintiffs for exercising their rights to keep and bear arms, a fundamental right, guaranteed by the Second Amendment to the United States Constitution, in a manner that violates their due process rights, including any and all pre and post deprivation rights as should be afforded to them for using the personal information to run a cross-check against the "Terrorist Screening Database," for tagging a potential purchaser of firearms as a "match,"

for delaying an attempted firearms purchase, for withholding notification of being nominated to, placed in, or removed from the "Terrorist Screening Database," all as guaranteed by the Fifth Amendment to the United States Constitution.

119. The Defendants' unlawful and unconstitutional actions caused the Plaintiffs harm and they are entitled to compensatory and punitive damages.

## III. THE RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES.

120. The preceding allegations are realleged and incorporated by reference as if fully set forth herein.

121. The actions and omissions of the Defendants through the illegal use of confidential, personal information provided by the Plaintiffs through the NICS Firearms Background Check have deprived the Plaintiffs of their right to be free from unreasonable searches and seizures in violation of the Fourth Amendment of the United States Constitution.

122. The Defendants are targeting the Plaintiffs for exercising their rights to keep and bear arms, a fundamental right, guaranteed by the Second Amendment to the United States Constitution, in a manner that violates the rights of the Plaintiffs to be free from unwarranted searches and seizures, including the use of personal information given for the specific purpose of a "NICS Firearms Background Check" that is then used in an illegal and unconstitutional manner to cross-check

against a "Terrorist Screening Database," which information is also shared across numerous agencies, foreign governments, and private contractors, without any court application, warrant, or extra-statutory authority to access or use the information, for failing to safeguard the information in a manner consistent with federal statutes and regulations, and for failing to provide any manner of notification or remedy to the Plaintiffs that their information had been used in unauthorized and unconstitutional manners.

123.  The Defendants' unlawful and unconstitutional actions caused the Plaintiffs harm and they are entitled to compensatory and punitive damages.

## IV. THE RIGHT TO ENJOY THE EQUAL PROTECTION OF LAW AND BE FREE FROM DISCRIMINATION.

124.  The preceding allegations are realleged and incorporated by reference as if fully set forth herein.

125.  The actions and omissions of the Defendants to target the Plaintiffs through the NICS Firearms Background Check has discriminated against the Plaintiffs as potential customers of firearms and resulted in their stigmatization as terrorists and potential terrorists in violation of their rights under the Fourteenth Amendment of the United States Constitution.

126.  The Defendants are targeting the Plaintiffs for exercising their rights to keep and bear arms, a fundamental right, guaranteed by the Second Amendment to the

United States Constitution, in a manner that violates the rights of the Plaintiffs to the equal protection of the law in that the Plaintiffs belong to a class of persons who enjoy protections specified at law, such as the limited and specific use of information provided by them for the "NICS Firearms Background Check" and the freedom from becoming part of a national firearms registry, but even with those statutory and regulatory protections, the Plaintiffs have been systematically targeted as being potential "terrorists" for which the Defendants have misused the information for an agenda conterminously rejected by Congress, for pushing an agenda of equating potential purchasers of firearms with "terrorists" to elicit all of the discriminatory emotions associated with the term in the post-9/11 environment, and for using the discriminatory association of "gun owner" and "terrorist" to advance an illegal and unconstitutional agenda.

127.   The Defendants' unlawful and unconstitutional actions caused the Plaintiffs harm and they are entitled to compensatory and punitive damages.

## V. THE RIGHT TO PRIVACY.

128.   The preceding allegations are realleged and incorporated by reference as if fully set forth herein.

129.   The actions and omissions of the Defendants through the illegal dissemination of confidential, personal information provided by the Plaintiffs through the NICS Firearms Background Check throughout various, unauthorized offices and agencies

of the federal government and to foreign governments and private contractors have deprived the Plaintiffs of their right to privacy under the United States Constitution and under federal law.

130.  The Defendants are targeting the Plaintiffs for exercising their rights to keep and bear arms, a fundamental right, guaranteed by the Second Amendment to the United States Constitution, in a manner that violates the rights of the Plaintiffs to their privacy, including, but not limited to, failing to maintain the security of the information, sharing the information across unauthorized agencies and offices, foreign governments, and private contractors, using methods to obtain the information that corrupt the statutory and regulatory restrictions of other agency(ies), and training field agents to engage in corrupted activities for illegal and unconstitutional ends.

131.  The Defendants' unlawful and unconstitutional actions caused the Plaintiffs harm and they are entitled to compensatory and punitive damages.

## VIII. THE ADMINISTRATIVE PROCEDURE ACT.

132.  The preceding allegations are realleged and incorporated by reference as if fully set forth herein.

133.  The Plaintiffs seek relief under the Administrative Procedure Act at 5 U.S.C. §705(1) and (2)(A) – (D).

134. The actions of the Defendants were and continue to be an unlawful withholding or unreasonable delay of completion of the NICS Firearms Background Check, including, but not limited to, the use of a "delay" notification to an FFL dealer.

135. The actions of the Defendants were and continue to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in that the Defendants' own analytic information demonstrates the absence of any correlation between a law-abiding customer attempting to purchase a firearm at an FFL dealer and illegal activity involving a firearm by an individual(s) convicted of "terrorist" activity.

136. The actions of the Defendants were and continue to be contrary to the constitutional rights of the Plaintiffs, and were and continue to exceed their constitutional and legal authority, in that the Defendants abused the availability of NICS Firearms Background Check Information for uses not authorized by law, contrary to statutory and regulatory limitations, and otherwise prohibited by the Constitution from government mass surveillance activities.

137. The actions of the Defendants were and continue to be in excess of statutory authority and limitations through, but not limited to, their use of NICS Firearms Background Check Information, their methods in obtaining information about potential purchasers of firearms through law-abiding means at FFL dealers, their storage of information required to be destroyed within statutory and regulatory

time periods, and their publication of information beyond those authorized access through limited statutes and regulations.

138. The actions of the Defendants were and continue to be without observance of procedure required by law, including, but not limited to, the lack of notification of law-abiding potential purchasers of firearms on the illegal and unconstitutional access to and use of the NICS Firearms Background Check Information, the illegal and unconstitutional use of the information, the methods used to obtain information about potential purchasers of firearms through law-abiding means at FFL dealers, the storage of information required to be destroyed within statutory and regulatory time periods, and the publication of information beyond those authorized access through limited statutes and regulations

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request the Court grant the following relief:

I.    A certification of this case as a class action, offering relief on a nationwide basis to all persons who have been potential purchasers of firearms at FFL dealers between February 2004 and December 2015, and who during this period completed and submitted to a "NICS Firearms Background Check;"

II.   A declaration that the Defendants' use of the NICS Firearms Background Check data in conjunction with the Terrorist Screening Database is unconstitutional under the Second Amendment, the Fourth Amendment Search and Seizure Clause, the Fifth Amendment Due Process Clause, the Fourteenth Amendment Equal

Protection Clause, and privacy rights, generally, and is otherwise illegal under federal law;

III.   A preliminary and then a permanent injunction, under 28 U.S.C. §§2201-2202, enjoining the Defendants, their officers, agents, and employees from the use of any and all information captured during the NICS Firearms Background Check to use in conjunction with any and all databases that can be referred to or are under the aegis of the "Terrorist Screening Database" of the Terrorist Screening Center to cross-check whether a potential firearms customer is also an alleged "terrorist;"

IV.   An order that the Defendants are required to immediately release personal information to each Plaintiff of which the Defendants are in possession concerning each Plaintiff's ATF Form 4473, each Plaintiff's potential firearms purchase, each Plaintiff's firearms transaction, each Plaintiff's database listing, including, but not limited to that which may be contained in the "Terrorist Screening Database;"

V.   An order that the Defendants be required to immediately transmit written notification to every person who has submitted to a NICS Firearms Background Check since February 2004 that they were subjected to an unauthorized background check through the Terrorist Screening Center and against the "Terrorist Screening Database," including in such written notification the process through which the potential firearms customer can request a copy of all of his or her personal information, identical to that which will be released to the Plaintiffs through this lawsuit;

VI.   An order directing the Defendants purge all electronic and any paper records collected since February 2004 relating to the NICS Firearms Background Check, excepting those specified transactions that include the instance of a denial of a firearm purchase due to the existence of a confirmed, federal disqualifying event, as delineated under 18 U.S.C. §922(g)(1)-(9);

VII.   An award of monetary damages, including punitive damages, to the Plaintiffs, for the violation of their constitutional rights, including, but not limited to, the discrimination of equating potential customers of firearms with "terrorists," the breach and dissemination of personal information, and the emotional distress that resulted from the actions of the Defendants undertaken in flagrant violation of federal statutes and regulations and of the United States Constitution;

VIII.   An award of attorney's fees and costs to the Counsel for the Plaintiff pursuant to 28 U.S.C. §2412 and/or 42 U.S.C. §1988; and,

IX.   An award such other, further, and different relief as to the Court is just.

Dated:   January 11, 2016
Webster, New York

By:   _Paloma A. Capanna_
Paloma A. Capanna, Attorney
633 Lake Road
Webster, New York 14580
(585) 377-7260
paloma@law-policy.com

## APPENDIX A:   **Freedom of Information/Privacy Act Request**

**This Freedom of Information/Privacy Act Request seeks all records of the Federal Bureau of Investigation, the Terrorist Screening Center, and of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, regarding the person whose information and certification of identity is filled in, below.  The term "records" is used to reference all information, including, but not limited to, (1.) documentation that the individual is or ever has been included in one or more databases referred to as the "Terrorist Identities Database," "Terrorist Screening Database," "No Fly List," "NICS Index," and/or the "NICS Audit Log;" and, (2.) documentation relating to the individual's submission of an "ATF Form 4473," including the manufacturer, model, and serial number from said form.**

**Please note:**

- **expedited processing is requested.**  The information sought involves possible questions about the government's integrity which will effect public confidence in the government.

- **fee waiver is requested.**  Disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government.  This request is part of a national "Stop the Secrecy!" campaign.

Your Full Name:  _____

Citizenship Status:[21]  _____   Social Security No.:[22]  _____

Current Address:  _____

Date of Birth:  _____   Place of Birth:  _____

### **Certification of Identity**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. §1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. §552a(i)(3) by a fine of not more than $5,000.

Signature:  _____   Date:  _____

---

[21]  Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.

[22]  Providing a Social Security Number is voluntary.  It may assist in the identification of records relating to you.