*Robinson v. Lynch*

Exhibit Group A

Exhibit #5 – Letter from GAO to Representative John Conyers
(dated May 21, 2009)



**G A O**
Accountability ★ Integrity ★ Reliability

United States Government Accountability Office
Washington, DC  20548

May 21, 2009

The Honorable John Conyers, Jr.
Chairman
Committee on the Judiciary
House of Representatives

The Honorable Robert C. Scott
Chairman
Subcommittee on Crime, Terrorism, and Homeland Security
Committee on the Judiciary
House of Representatives

The Honorable Frank R. Lautenberg
United States Senate

Subject:  Firearm and Explosives Background Checks Involving Terrorist Watch List Records

This letter formally transmits the enclosed briefing in response to your request. Specifically, you requested that we update our January 2005 report entitled, *Gun Control and Terrorism: FBI Could Better Manage Firearm-Related Background Checks Involving Terrorist Watch List Records*, GAO-05-127 (Washington, D.C.: Jan. 19, 2005).

Under the Brady Handgun Violence Prevention Act and implementing regulations, the Federal Bureau of Investigation (FBI) and designated state and local criminal justice agencies use the FBI's National Instant Criminal Background Check System (NICS) to conduct checks on individuals before federal firearms licensees (gun dealers) may transfer any firearm to an unlicensed individual.[1]  Also, to assist the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the FBI conducts NICS background checks on individuals seeking to obtain a federal explosives license or permit.[2]  Under current law, there is no basis to automatically prohibit a person from

---

[1] Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993).

[2] See Safe Explosives Act, Pub. L. No. 107-296, 116 Stat. 2135, 2280 (2002) (Title XI, Subtitle C of the Homeland Security Act of 2002), as amended.

possessing firearms or explosives because they appear on the terrorist watch list.[3] Rather, there must be a disqualifying factor (i.e., prohibiting information) pursuant to federal or state law, such as a felony conviction or illegal immigration status.

In response to your request, this report addresses (1) the number of NICS background checks involving terrorist watch list records, the related results, and the FBI's current procedures for handling these checks and (2) the extent to which the FBI has taken action to collect information from NICS background checks involving terrorist watch list records and share this information with counterterrorism officials to support investigations and other counterterrorism activities. To conduct this work, we reviewed relevant laws, regulations, policies, and procedures related to NICS background checks on individuals attempting to purchase firearms or obtain a firearm or explosives license or permit. We also obtained data on NICS background checks that resulted in valid matches with terrorist watch list records from February 2004 (when NICS started checking against terrorist watch list records) through February 2009. We discussed the sources of data with FBI officials as well as the policies and procedures that FBI officials used to maintain the integrity of the data, and determined that the data were sufficiently reliable for the purposes of this review. We also reviewed FBI policies and procedures for collecting and sharing information related to NICS background checks involving terrorist watch list records, and interviewed officials from relevant FBI components.

In summary, from February 2004 through February 2009, FBI data show that 963 NICS background checks resulted in valid matches with terrorist watch list records; of these matches, approximately 90 percent were allowed to proceed because the checks revealed no prohibiting information and about 10 percent were denied. Regarding FBI procedures for handling these checks, in response to a recommendation in our January 2005 report, the FBI began conducting all NICS background checks involving terrorist watch list records in July 2005—including those generated via state operations—to ensure consistency in handling.[4] Moreover, in April 2005, the FBI issued guidance to its field offices on the availability and use of information collected as a result of NICS background checks involving terrorist watch list records to help support investigations and other counterterrorism efforts. In April 2007, the Department of Justice (DOJ) provided legislative language to Congress that would give the Attorney General discretionary authority to deny the transfer of firearms or the issuance of a firearm or explosives license or permit when a NICS background check reveals that the purchaser is a known or suspected terrorist and the Attorney General reasonably believes that the person may use a firearm or explosives in connection with terrorism. A related bill was introduced in the 111th Congress and is currently pending (H.R. 2159). Neither DOJ's proposed legislative language nor the related bill include provisions for the development of guidelines further delineating the circumstances under which the Attorney General

---

[3] The FBI's Terrorist Screening Center maintains the U.S. government's terrorist watch list, which contains information about individuals "known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism." Applicable records from the watch list are searched during NICS background checks.

[4] GAO-05-127.

could exercise this authority.  In October 2007, we reported that agencies that use terrorist watch list records to screen for potential terrorists use applicable laws or other guidelines as a basis for determining what related actions to take, if any, such as the criteria that are used for determining which subjects of watch list records should be precluded from boarding an aircraft.[5]  Further, Homeland Security Presidential Directive 11 requires that terrorist watch list records be used in a manner that safeguards legal rights, including freedoms, civil liberties, and information privacy guaranteed by federal law.[6]  Guidelines delineating how the Attorney General could use any new authority would help DOJ and its component agencies (1) provide accountability and a basis for monitoring to ensure that the intended goals for, and expected results of, the screening are being achieved and (2) ensure that terrorist watch list records are used in accordance with requirements outlined in the Presidential directive.  In response to our questions, DOJ was noncommittal on whether it would develop guidelines if legislation providing the Attorney General with discretionary authority to deny firearms or explosives transactions involving subjects of terrorist watch list records was enacted.

GAO is not making any recommendations to DOJ related to this report.  However, if Congress moves forward with legislation that provides the Attorney General with discretionary authority to deny the transfer of a firearm or the issuance of a firearm or explosives license or permit to the subject of a terrorist watch list record, Congress should consider including provisions that require the Attorney General to establish guidelines delineating under what circumstances such authority could be exercised.  For additional information on a summary of the results of our work, see slides 14 through 19.

DOJ did not comment on the findings or matter for congressional consideration in this report.  The FBI and ATF provided technical comments, which have been incorporated where appropriate.

───────────

As arranged with your offices, unless you publicly announce its contents earlier, we plan no further distribution of this report until 30 days after its issue date.  At that time, we will send copies of this report to the Attorney General and the Directors of the FBI and ATF, appropriate congressional committees, and other interested parties.  This report will also be available at no charge on our website at http://www.gao.gov.  If you or your staff have any questions about this report, please contact me at (202) 512-8777 or larencee@gao.gov.  Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report.  Key

───────────────────

[5] See GAO, *Terrorist Watch List Screening, Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110 (Washington, D.C.: Oct. 11, 2007).

[6] The White House, *Homeland Security Presidential Directive/HSPD-11, Subject: Comprehensive Terrorist-Related Screening Procedures* (Washington, D.C.: Aug. 27, 2004).

contributors to this report were Eric Erdman, Assistant Director; David Alexander, Christopher Currie, Geoffrey Hamilton, Linda Miller, and Debra Sebastian.

*Eileen Regan Larence*

Eileen R. Larence
Director, Homeland Security and Justice Issues

Enclosure

Enclosure

Terrorist Watch List Screening



**GAO**
Accountability * Integrity * Reliability

## Briefing Overview

- Introduction
- Objectives, Scope, and Methodology
- Summary
- Background
- Results
- Conclusions
- Matter for Congressional Consideration
- Agency Comments and Our Evaluation

2

GAO-09-125R  NICS and Terrorist Watch List Records



## Introduction

- Ensuring that firearms and explosives do not get into the hands of those intent on doing harm to U.S. interests is of great importance to the nation's security.

- The mission of the Federal Bureau of Investigation's (FBI) section that operates the National Instant Criminal Background Check System (NICS Section) is to ensure national security and public safety by providing the timely determination of a person's eligibility to possess firearms or explosives in accordance with federal law.

- Under the Brady Handgun Violence Prevention Act (Brady Act) and implementing regulations, since November 1998, the FBI and designated state and local criminal justice agencies have, in general, been required to use NICS to conduct background checks on individuals before federal firearms licensees (gun dealers) may transfer any firearm to an unlicensed individual.[1]

---

[1] Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993).

3



## Introduction (continued)

- Pursuant to the Safe Explosives Act, in general, any person seeking to (1) engage in the business of importing, manufacturing, or dealing in explosive materials or (2) transport, ship, cause to be transported, or receive explosive materials must obtain a federal license or permit, respectively, issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).[2] To assist ATF, in February 2003, the NICS Section began conducting background checks on individuals seeking to obtain an explosives license or permit.

- Persons prohibited by federal law from possessing firearms or explosives include convicted felons, fugitives, unlawful controlled substance users and persons addicted to a controlled substance, and aliens (any individual not a citizen or national of the United States) who are illegally or unlawfully in the United States, among others.[3]

[2] Safe Explosives Act, Pub. L. No. 107-296, 116 Stat. 2135, 2280 (2002) (Title XI, Subtitle C of the Homeland Security Act of 2002), as amended.

[3] See 18 U.S.C. § 922(g), § 922(n), § 841(i).

4



## Introduction (continued)

- One of the databases searched by NICS is the FBI's National Crime Information Center database,[4] which contains criminal justice information (e.g., names of persons who have outstanding warrants) and also includes applicable records from the Terrorist Screening Center's (TSC) consolidated terrorist watch list.[5]

- The terrorist watch list records are maintained in the National Crime Information Center's Violent Gang and Terrorist Organization File, which was designed to provide law enforcement personnel with the means to exchange information on members of violent gangs and terrorist organizations.

- Homeland Security Presidential Directive 11 (HSPD-11) requires that terrorist-related screening—including the use of terrorist watch list records—be done in a manner that safeguards legal rights, including freedoms, civil liberties, and information privacy guaranteed by federal law.[6]

---

[4] The FBI's National Crime Information Center is a computerized database of documented criminal justice information.

[5] TSC's consolidated terrorist watch list contains information about individuals "known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism."

[6] The White House, *Homeland Security Presidential Directive/HSPD-11, Subject: Comprehensive Terrorist-Related Screening Procedures* (Washington, D.C.: Aug. 27, 2004).

5



## Introduction (continued)

- According to the Department of Justice (DOJ), under current federal and state law, there is no basis to automatically prohibit a person from possessing a firearm or explosives because they appear on the terrorist watch list. Rather, there must be a disqualifying factor pursuant to federal or state law, such as a felony conviction or illegal immigration status.

- In February 2004, pursuant to a DOJ directive, the NICS Section began delaying all firearm and explosives background checks involving terrorist watch list records to give NICS personnel and FBI case agents the chance to further research the transaction for prohibiting information before responding to the initiator of the background check as to whether the transaction may proceed.  For example, the FBI could have information not yet posted to the databases checked by NICS showing the person is an alien illegally or unlawfully in the United States.

6



## Introduction (continued)

- In January 2005, we reported that from February 2004 through June 2004, a total of 44 firearm-related background checks handled by the FBI's NICS Section and applicable state agencies resulted in valid matches with terrorist watch list records.[7] Of this total, 35 transactions were allowed to proceed because the background check revealed no prohibiting information and 6 transactions were denied based on existing federal or state firearms prohibiting criteria.[8]

---

[7] GAO, *Gun Control and Terrorism, FBI Could Better Manage Firearm-Related Background Checks Involving Terrorist Watch List Records*, GAO-05-127 (Washington, D.C.: Jan. 19, 2005).

[8] Of the remaining three transactions, one was pending a final proceed or denied determination, and the results of two were not available.

7



## Introduction (continued)

- To assist the FBI in better managing NICS background checks involving terrorist watch list records, we made two recommendations:

  - To ensure that the background checks initiated by state agencies are consistently and properly handled, we recommended that the Attorney General either implement more frequent monitoring by the FBI of applicable state agencies or have the FBI centrally manage all terrorism-related NICS background checks.

  - To support the FBI's counterterrorism efforts, we recommended that the Attorney General clarify procedures to ensure that the maximum amount of allowable information from these background checks is consistently shared with counterterrorism officials.

8



## Introduction (continued)

- DOJ agreed with our recommendations and subsequently formed a working group to consider the issues raised by our report.  In June 2005, the working group recommended that the FBI make four changes, which are summarized below:

  - Establish a database (outside the NICS Section) to track subjects of terrorist watch list records who acquire or seek to acquire a firearm and appoint an analyst to review this information and develop appropriate intelligence.

  - Have the NICS Section process all NICS transactions involving terrorist watch list records, rather than allowing states to process the transactions.

  - Clarify that the NICS Section will routinely request the prospective purchaser's residence address from the gun dealer and share it with FBI counterterrorism officials while attempting to verify the match and obtain related information.

  - Encourage FBI agents to coordinate with ATF to obtain, among other things, the make, models, and quantities of firearms purchased.

9



GAO
Accountability • Integrity • Reliability

## Introduction (continued)

- The DOJ working group concluded that the best course of action to address concerns about the ability of terrorists to obtain a firearm or a firearm or explosives license or permit would be to introduce legislation that would allow the Attorney General discretion to deny such transactions, if necessary.

- The status of DOJ's actions to address our recommendations and those of the working group are discussed later in this report.

10



## Objectives, Scope, and Methodology

- You requested that we update our January 2005 report. Thus, this briefing addresses the following questions:

  - How many NICS background checks have resulted in valid matches with terrorist watch list records, what were the results of these checks, and what are the NICS Section's current procedures for handling these checks?

  - Since January 2005, to what extent has the FBI taken action to collect information from NICS background checks involving terrorist watch list records and share this information with counterterrorism officials to support investigations and other counterterrorism activities?

11



## Objectives, Scope, and Methodology (continued)

- We reviewed relevant laws, regulations, policies, and procedures related to NICS background checks on individuals attempting to purchase firearms or obtain a firearm or explosives license or permit.

- We obtained data on NICS background checks that resulted in valid matches with terrorist watch list records during the period February 2004 (when NICS started checking against terrorist watch list records) through February 2009.  We discussed the sources of data with FBI officials as well as the policies and procedures that FBI officials used to maintain the integrity of the data, and determined that the data were sufficiently reliable for the purposes of this review.

12



## Objectives, Scope, and Methodology (continued)

- We interviewed officials from FBI components—the NICS Section, Counterterrorism Division (including the National Threat Center Section and its Terrorist Screening Operations Unit and Threat Review Unit), and TSC—to discuss policies and procedures for conducting NICS background checks involving terrorist watch list records and collecting and sharing related information.  We attempted to contact members of the DOJ working group that was established to consider issues raised by our January 2005 report, but DOJ officials told us they were no longer at the department.

- We conducted this performance audit from August 2008 through May 2009 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

13



## Summary

___Number of Terrorism-Related Checks and NICS Section Procedures for Handling Them___

- From February 2004 through February 2009, FBI data show that 963 NICS background checks resulted in valid matches with terrorist watch list records; approximately 90 percent of these transactions were allowed to proceed because the checks revealed no prohibiting information—such as felony convictions, illegal immigrant status, or other disqualifying factors—and about 10 percent of the transactions were denied.

- In response to our January 2005 recommendation and a related DOJ working group recommendation, the NICS Section began processing all background checks involving terrorist watch list records in July 2005—including those generated via state operations—to ensure consistency in handling and to ensure that relevant FBI components and field agents are contacted during the resolution of the checks. Otherwise, since January 2005, there have been no substantive changes in NICS Section policies or procedures with respect to handling background checks involving terrorist watch list records or maintaining background check information, according to FBI officials.

14



## Summary (continued)

<u>FBI Actions to Use Information From NICS Checks For Counterterrorism Purposes</u>

- In response to our January 2005 recommendation and related DOJ working group recommendations, in April 2005, the FBI issued guidance to its field offices on the availability and use of information collected as a result of NICS background checks involving terrorist watch list records to help support investigations and other counterterrorism efforts. For example, to support counterterrorism efforts:

  - The guidance discussed the process for FBI field offices to work with the NICS Section and ATF to obtain additional information about the prospective purchaser (e.g., residence address) and the transaction, including the make, model, and serial number of any firearm purchased.

  - The guidance noted that any information that FBI field offices obtain related to these NICS checks can be shared with other counterterrorism and law enforcement agencies.

15



## Summary (continued)

- In line with a DOJ working group recommendation, the FBI is utilizing a TSC database to capture information related to each NICS background check that involves the subject of a terrorist watch list record.

  - According to FBI Counterterrorism Division officials, information related to each transaction is analyzed to develop appropriate intelligence and support ongoing counterterrorism investigations.

  - In October 2008, the Counterterrorism Division conducted a proactive analysis of information in the TSC database to identify, for example, geographic trends related to attempted firearm purchases by subjects of terrorist watch list records. The Counterterrorism Division plans to begin quarterly reporting of this type of analysis beginning in May 2009.

16



## Summary (continued)

- In April 2007, DOJ provided legislative language to Congress that would provide the Attorney General with discretionary authority to deny the transfer of firearms or the issuance of a firearm or explosives license or permit when a NICS background check reveals that the purchaser is a known or suspected terrorist and the Attorney General reasonably believes that the person may use a firearm or explosives in connection with terrorism.

- A related bill was introduced in the 111th Congress and is currently pending.

  - Neither DOJ's proposed legislative language nor the related bill include provisions for the development of guidelines further delineating the circumstances under which the Attorney General could exercise this authority.

  - Agencies that use terrorist watch list records to screen for potential terrorists use applicable laws or other guidelines as a basis for determining what related actions to take, if any.  For example, specific criteria are used for determining which subjects of watch list records should be precluded from boarding an aircraft.

17



## Summary (continued)

- Guidelines delineating how the Attorney General could use any new authority to deny NICS transactions involving subjects of terrorist watch list records would help DOJ and its component agencies:

    - Provide accountability and a basis for monitoring to ensure that the intended goals for, and expected results of, the screening are being achieved.

    - Ensure that terrorist watch list records are used in a manner that safeguards privacy and civil liberties protections, in accordance with requirements outlined in HSPD-11.

- In response to our questions, DOJ was noncommittal on whether it would develop guidelines if legislation providing the Attorney General with discretionary authority to deny firearms or explosives transactions involving subjects of terrorist watch list records was enacted.

18



## Summary (continued)

- GAO is not making any recommendations to DOJ related to this report. However, if Congress moves forward on legislation that provides the Attorney General with discretionary authority to deny the transfer of a firearm or the issuance of a firearm or explosives license or permit to the subject of a terrorist watch list record, Congress should consider including provisions that require the Attorney General to establish guidelines delineating under what circumstances such authority could be exercised.

- DOJ did not provide comments on the findings or matter for congressional consideration in this report. The FBI and ATF provided technical comments, which have been incorporated in this report where appropriate.

19



# Background

- TSC—an organization administered by the FBI—was established in 2003 to develop and maintain the U.S. government's consolidated terrorist screening database and to provide for the use of watch list records during security-related screening processes.

  - In general, individuals who are "reasonably suspected" of having possible links to terrorism—in addition to individuals with known links—are to be nominated for inclusion on the consolidated watch list by the FBI and other members of the intelligence community.[9]

  - One of the stated policy objectives for the government's consolidated watch list is the coordinated collection of information for use in investigations and threat analyses.

---

[9] See GAO, *Terrorist Watch List Screening, Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110 (Washington, D.C.: Oct. 11, 2007).

20



## Background (continued)

- According to DOJ, the purpose of NICS background checks is to determine the lawfulness of proposed gun transfers or licenses or applicant eligibility for an explosives permit or license.

- NICS Section personnel are to provide all available information to the FBI's Counterterrorism Division in order to determine if there is a valid match between the prospective purchaser or permit applicant and a terrorist watch list record. Also, NICS Section personnel seek from the FBI's Counterterrorism Division potentially prohibiting information that is not maintained in the databases searched by NICS.

- The FBI can benefit, however, from receiving this information because it may be useful to a counterterrorism or counterintelligence investigation.

21



## Objective 1:  Number of NICS Checks Involving Terrorist Watch List Records and Procedures for Handling These Checks

- According to NICS Section data, during the period February 2004 through February 2009, a total of 963 NICS background checks resulted in valid matches with terrorist watch list records.[10]

  - Of these transactions, approximately 90 percent (865 of 963) were allowed to proceed because the checks revealed no prohibiting information—that is, the persons who were subjects of terrorist watch list records were deemed eligible to possess or receive a firearm or explosives.  The NICS Section does not know if a firearm was actually transferred or if a firearm or explosives license or permit was granted.

  - One of the 963 transactions involved an explosives background check, which was allowed to proceed because the check revealed no prohibiting information.

[10] NICS transactions involving subjects of terrorist watch list records that were processed by state agencies before July 17, 2005, may not be included in the data maintained by the NICS Section if the state processing the transaction did not provide the final outcome of the transaction to the NICS Section.  Effective July 17, 2005, the NICS Section assumed the processing of all NICS transactions involving terrorist watch list records to ensure consistency in processing and the collection of related data.

22



## Objective 1:  Number of NICS Checks Involving Terrorist Watch List Records and Procedures for Handling These Checks (continued)

- Of the NICS background checks that resulted in valid matches with terrorist watch list records, about 10 percent (98 of 963) of the transactions were denied based on the existence of prohibiting information.  Available information provided by the NICS Section shows that the reasons for denials included:

  - felony conviction,
  - illegal alien status,
  - fugitive from justice, and
  - unlawful use of, or addicted to, a controlled substance.

- All of the 98 transactions that were denied involved subjects of terrorist watch list records who were determined to be ineligible to possess or receive a firearm based on federal or state firearm prohibitions.  There were no denied transactions involving explosives background checks.

23



## Objective 1:  Number of NICS Checks Involving Terrorist Watch List Records and Procedures for Handling These Checks (continued)

- In response to our January 2005 recommendation and the related DOJ working group recommendation, DOJ determined that all NICS background checks involving terrorist watch list records must be handled centrally by staff of the NICS Section—rather than allowing states to process them—to help ensure consistency in handling and to help ensure that relevant FBI components and field agents are contacted during the resolution of the checks to see if they have information that would prohibit the transaction.

- Other than having the NICS Section assume responsibility for handling all NICS transactions involving terrorist watch list records, since January 2005, there have been no substantive changes in NICS Section policies or procedures with respect to handling background checks involving terrorist watch list records, according to FBI officials.

24



**Objective 1:  Number of NICS Checks Involving Terrorist Watch List Records and Procedures for Handling These Checks (continued)**

- In July 2005, the FBI's NICS Section began processing all background checks involving terrorist watch list records.

  - If a potential match is identified, the NICS Section is to delay the transaction and coordinate with TSC to verify the match.[11] To determine if the match is valid, TSC compares identifiers provided by the prospective purchaser—such as name and date of birth—with available identifiers in watch list records.

  - For verified matches, NICS Section personnel are to contact the FBI's Counterterrorism Division to determine if FBI case agents have information that may disqualify the individual from possessing a firearm or explosives—such as information that has been recently acquired but not yet available in the automated databases searched by NICS.

[11] Under the Brady Act, the NICS Section can delay the transfer of a firearm for 3 business days.  After the third business day, the gun dealer is not prohibited from transferring the firearm, although federal law does not compel the gun dealer to transfer.

25



**Objective 1:  Number of NICS Checks Involving Terrorist Watch List Records and Procedures for Handling These Checks (continued)**

- To assist the FBI's Counterterrorism Division in searching for prohibiting information, NICS Section personnel are to share all available information that is captured in the NICS database with the case agent—name, date of birth, place of birth, height, weight, sex, race, country of citizenship, alien or admission number, type of firearm involved in the check (handgun, long gun, or other), and any exceptions to disqualifying factors claimed by an alien.

- If a gun dealer is not notified of disqualifying information within 3 business days, the transaction may proceed and the gun dealer may lawfully transfer a firearm to the subject of a terrorist watch list record.  The 3-business-day provision is not applicable to the issuance of a license or permit for firearms or explosives.

- According to FBI officials, several of the 98 firearm transactions involving terrorist watch list records that were denied by the NICS Section were denied based on information provided by FBI case agents (e.g., the individual was an alien illegally or unlawfully in the United States), but specific data on the number of such denials were not maintained.

26



## Objective 1:  Number of NICS Checks Involving Terrorist Watch List Records and Procedures for Handling These Checks (continued)

- According to NICS Section officials, since GAO issued its report in January 2005, there have been no changes in NICS regulations, policies, or procedures for maintaining records of NICS background checks involving terrorist watch list records.  Under current regulations, policies, or procedures:

  - All personal identifying information in the NICS database related to firearms transfers that are allowed to proceed is to be destroyed within 24 hours after the FBI advises the gun dealer that the transfer may proceed.  The 24-hour destruction requirement does not apply to permit checks.  Rather, information related to permit checks is retained in the NICS database for up to 90 days after the background check is initiated.

27



## Objective 1:  Number of NICS Checks Involving Terrorist Watch List Records and Procedures for Handling These Checks (continued)

- Nonidentifying information related to each proceeded background check (e.g., NICS transaction number, date of the transaction, and gun dealer identification number) is retained for up to 90 days.  By retaining such information, the NICS Section can notify ATF when new information reveals that an individual who was approved to purchase a firearm should have been denied.  ATF can then initiate any firearm retrievals that may be necessary.

  - The nonidentifying information is retained for all NICS transactions that are allowed to proceed, including transactions involving subjects of terrorist watch list records.

  - According to NICS Section officials, the NICS Section has made no firearm-retrieval referrals to ATF related to transactions involving subjects of terrorist watch list records.

28



**Objective 1:  Number of NICS Checks Involving Terrorist Watch List Records and Procedures for Handling These Checks (continued)**

- If NICS Section personnel cannot make a final proceed or deny determination within 3 business days, personal identifying information and other details related to the transaction are retained until either (1) the final determination is reached or (2) a period of no more than 90 days.  This would include, for example, transactions involving a terrorist watch list record in which NICS personnel did not receive a response from FBI agents within 3 business days.

- Under provisions in NICS regulations, personal identifying information and other details related to denied firearms transactions are retained indefinitely.

29



## Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes

- In response to our recommendation and the related DOJ working group's recommendations, in April 2005, FBI headquarters provided guidance to its field offices on the types of information available to a field office and the process for obtaining that information if a known or suspected terrorist attempts to obtain a firearm from a gun dealer or a firearm or explosives license or permit.[12]

  - Regarding gun purchases, the guidance notes the following:

    - If requested by an FBI field office, NICS personnel have been instructed to contact the gun dealer to obtain additional information, such as the purchaser's residence address and the government-issued photo identification used by the purchaser (e.g., a drivers license number). However, gun dealers are not legally obligated under NICS regulations to provide this information to NICS personnel for the purpose of a background check.

[12] The Gun Control Act of 1968, as amended, gives the Attorney General the authority to inspect or examine the records of a gun dealer without a warrant "in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the [federal firearms] licensee." See 18 U.S.C. § 923(g)(1)(B)(i).

30



**Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes (continued)**

- • If the gun dealer refuses, FBI field offices are encouraged to coordinate with ATF to obtain this information.  ATF can also obtain a copy of the form individuals must fill out to purchase firearms (ATF Form 4473) and other information—such as the make, model, and serial number of any firearm purchased—which may be useful to FBI counterterrorism officials.

- • Regarding a firearm or explosives permit, the FBI's April 2005 guidance notes the following:

  - • For state permits that are approved by ATF as alternative permits that can be used to purchase firearms, if requested by an FBI field office, NICS personnel have been instructed to contact the gun dealer to obtain all information from the permit application.

  - • The use and dissemination of state permit information is governed by state law.  The FBI has advised state and local agencies that also issue firearm or explosives permits to share all information with FBI field personnel to the fullest extent allowable under state law.

31



## Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes (continued)

- According to the FBI's April 2005 guidance, there are no provisions in the Brady Act that place limitations on sharing NICS information with law enforcement agencies when persons are determined to be prohibited from possessing or receiving a firearm, and NICS information on denied transactions can be and is routinely provided to ATF.

- FBI field offices may share any information obtained under procedures in the April 2005 guidance with other law enforcement, counterterrorism, or counterintelligence agencies, including non-FBI members of an FBI Joint Terrorism Task Force.[13]

[13] Joint Terrorism Task Forces are teams of state and local law enforcement officials, FBI agents, and other federal agents and personnel whose mission is to investigate and prevent acts of terrorism.

32



**Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes (continued)**

- In line with a DOJ working group recommendation, the FBI is utilizing a TSC database—the "Encounter Management Application"—to capture information on attempted firearm purchases by subjects of terrorist watch list records.  According to FBI Counterterrorism Division officials, each separate instance of an individual on the terrorist watch list who acquires or seeks to acquire a firearm is analyzed to develop appropriate intelligence and support ongoing counterterrorism investigations.

33



**Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes (continued)**

- In October 2008, the FBI's Counterterrorism Division conducted—for the first time— a proactive analysis of the information related to NICS background checks involving subjects of terrorist watch list records that is captured in the TSC database. According to FBI Counterterrorism Division officials, this analysis was conducted in support of presidential inauguration activities and the identification of subjects who could impact events.

    - Through this analysis, the Counterterrorism Division identified whether the NICS background checks involved subjects of domestic or international counterterrorism investigations as well as where the firearm purchases were attempted, among other things.

    - Based on the value derived from conducting this analysis, the Counterterrorism Division plans to conduct similar proactive analysis and produce quarterly reports that summarize these analytical activities beginning in May 2009.

34



**Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes (continued)**

- The DOJ working group concluded that the best course of action to address concerns about the ability of terrorists to obtain a firearm or a firearm or explosives license or permit would be to introduce legislation that would allow the Attorney General discretion to deny such transactions, if necessary.

- DOJ drafted and provided legislative language entitled "Denying Firearms and Explosives to Dangerous Terrorists Act of 2007" to the House and Senate in April 2007.  Among other things, the draft proposal:

  - Provides the Attorney General with discretionary authority to deny the transfer of a firearm or the issuance of a firearm or explosives license or permit when a background check reveals that the purchaser is a known or suspected terrorist and the Attorney General reasonably believes that the person may use a firearm or explosives in connection with terrorism.

35



## Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes (continued)

- Includes provisions designed to provide due process safeguards that afford an affected person an opportunity to challenge a denial by the Attorney General.

- Includes provisions designed to protect the sensitive national security information upon which terrorist watch list records are based.

- A related bill was introduced in the House of Representatives during the 111th Congress and is currently pending.[14]

- Neither DOJ's proposed legislative language nor the related bill include provisions for the development of guidelines further delineating the circumstances under which the Attorney General could exercise this authority.

[14] See H.R. 2159.

36



## Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes (continued)

- Because individuals can be added to the terrorist watch list based on "reasonable suspicion," the government has not used their inclusion on the watch list to automatically deny certain actions, such as automatically prohibiting an individual from entering the United States or boarding an aircraft.  Rather, when an agency identifies the subject of a watch list record, agency officials are to assess the threat the person poses to determine what action to take, if any, in accordance with applicable laws or other guidelines.[15]  For example:

  - The Immigration and Nationality Act establishes conditions under which an alien may be deemed inadmissible to the United States. (See, for example, 8 U.S.C. § 1182.)

  - The White House Homeland Security Council has established criteria for determining which subjects of terrorist watch list records are deemed to be a threat to civil aviation or national security and therefore should be precluded from boarding an aircraft.

[15] See GAO-08-110.

37



**Objective 2:  FBI Actions to Use Information From NICS Checks Involving Terrorist Watch List Records For Counterterrorism Purposes (continued)**

- Guidelines delineating how the Attorney General could use any new authority to deny firearms or explosives transactions involving subjects of terrorist watch list records would help DOJ and its component agencies:

    - Provide accountability and a basis for monitoring to ensure that the intended goals for, and expected results of, the screening are being achieved.

    - Ensure that terrorist watch list records are used in a manner that safeguards privacy and civil liberties protections, in accordance with requirements outlined in HSPD-11.

- In response to our questions, DOJ was noncommittal on whether it would develop guidelines if legislation providing the Attorney General with discretionary authority to deny firearms or explosives transactions involving subjects of terrorist watch list records was enacted.

38

GAO-09-125R  NICS and Terrorist Watch List Records



## Conclusions

- The use of terrorist watch list records in agency screening processes is an integral component of the U.S. government's counterterrorism efforts.  Providing the Attorney General with the flexibility to deny firearm purchases or firearm or explosives licenses or permits to subjects of terrorist watch list records when information suggests the purchase could pose a threat to national security would help to address concerns that such transactions cannot be denied now unless the subject is otherwise prohibited by federal or state law.  Nevertheless, it would be important to consider the extent to which any new authorities to deny firearm or explosives transactions should include guidelines on the basis for making denials, which would help to ensure that terrorist watch list records are used as intended and that privacy and civil liberties protections are in place.

39



**GAO**
Accountability • Integrity • Reliability

## Matter for Congressional Consideration

- GAO is not making any recommendations to DOJ related to this report.  However, if Congress moves forward on legislation that provides the Attorney General with discretionary authority to deny the transfer of a firearm or the issuance of a firearm or explosives license or permit to the subject of a terrorist watch list record, Congress should consider including provisions that require the Attorney General to establish guidelines delineating under what circumstances such authority could be exercised.

40



## Agency Comments and Our Evaluation

- We provided a draft of this report to DOJ for review and comment.

- DOJ did not provide comments on the findings or matter for congressional consideration in this report.

- On May 11, 2009, DOJ provided technical comments from the FBI and ATF, which have been incorporated in this report where appropriate.

41

(440751)

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Web site: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7125 <br> Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |