UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM ROBINSON, et al.,

           Plaintiffs,

                     Case # 15-CV-6765-FPG

v.

                     DECISION AND ORDER

JEFF B. SESSIONS, Attorney General
of the United States, et al.,

           Defendants.
_____

## INTRODUCTION

This is a challenge to the constitutionality of government conduct allegedly taken in the course of conducting background checks pursuant to the Gun Control Act, 18 U.S.C. §§ 921-931 (1968), and the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993). The Gun Control Act bans certain persons from possessing firearms. *See* 18 U.S.C. § 922(d)(1)-(9). The Brady Act establishes a national instant criminal background check system ("NICS") and requiring that federally licensed firearms dealers consult it before transferring firearms to potential purchasers. *See* Pub. L. No. 103-159.

Plaintiffs are a collection of individuals and associations who are "outspoken critics against government infringement of Second Amendment and additional civil liberties." ECF No. 3, ¶ 75. Defendants are the Director of the Federal Bureau of Investigation, the Director of the

1

Terrorist Screening Center, the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Attorney General of the United States.[1]  ECF No. 3.

Plaintiffs allege that, in February 2004, Defendants began searching the Consolidated Terrorist Screening Database ("TSDB") in the course of conducting NICS background checks. ECF No. 3, ¶ 19.  Plaintiffs further allege that, when a potential firearms purchaser matches a person listed in the TSDB, Defendants compile, retain, and disclose the potential purchaser's personal information for counterterrorism purposes.  *Id.* at ¶¶ 24-30.  Plaintiffs do not allege that they were denied firearms, that they are listed in TSDB, or that Defendants have compiled, retained, or disclosed their personal information.  Rather, Plaintiffs allege that each Plaintiff "has completed" the form that initiates an NICS background check since February 2004 and that each Plaintiff "wants to continue" to purchase firearms through federally licensed dealers.  *Id.* at ¶ 81.  Plaintiffs also allege that Defendants' conduct has forced them to choose between their First and Second Amendment rights, *id.* at ¶ 84, and has branded them as terrorists or potential terrorists.  *Id.* at ¶ 80.  Plaintiffs challenge the search of the TSDB and subsequent data collection under the Second Amendment, Procedural and Substantive Due Process, the Fourth Amendment, the Equal Protection Clause, and the Administrative Procedure Act.  *Id.* at ¶¶ 111-38.

Defendants contend as a threshold matter that Plaintiffs lack standing to bring this challenge in federal court.  ECF No. 6-1 at 7-12.  Defendants also argue that the lawsuit lacks merit because Plaintiffs fail to plead a cognizable claim under any of their six causes of action. *Id.* at 12-25.  In response, Plaintiffs moved for summary judgment.  ECF No. 9-7.  For the reasons explained below, the Court finds that Plaintiffs do not have standing to challenge the

---

[1]  Attorney General Jeff B. Sessions should be substituted for former Attorney General Loretta Lynch, and Bureau of Alcohol, Tobacco, Firearms and Explosives Director Byron Todd Jones should be substituted for former Director Thomas E. Brandon as defendants in this case.  *See* FED. R. CIV. P. 25(d).

counterterrorism actions that Defendants take in the course of conducting NICS background checks.

## BACKGROUND

The Gun Control Act regulates the manufacture and sale of firearms and ammunition. *See* 18 U.S.C. §§ 921-31. In particular, it prohibits federally licensed firearms dealers from selling firearms to certain categories of individuals, such as any person under 21 or any person convicted of a felony. *See, e.g.*, *id.* at § 922(b), (d), (g). In 1993, Congress gave greater effect to those prohibitions by enacting the Brady Act. Pub. L. No. 103-159, 107 Stat. 1536. The Brady Act requires federally licensed firearms dealers to initiate criminal background checks to determine whether state or federal law prohibits potential purchasers from purchasing or possessing firearms before selling to them. *See id.* at § 103(b). To facilitate those background checks, the Brady Act directed the Attorney General to establish the NICS. *See id.* at § 102(a). The Attorney General delegated management of the system to the Federal Bureau of Investigations ("FBI"). *See* 28 C.F.R. § 25.3 (2015). Accordingly, the NICS is managed by the FBI Criminal Justice Information Services Division's NICS Operations Center. *Id.*

### *NICS Background Check Procedure Under the Brady Act*

An NICS background check proceeds in two stages. On the front end, the dealer collects information from the potential purchaser and provides some of that information to the NICS Operations Center. *See* 27 C.F.R. § 478.124 (2012). The dealer obtains from each potential purchaser a completed firearms transaction record ("Form 4473"). *See id*. Form 4473 asks for certain identifying information, such as the purchaser's name, sex, address, date of birth, height, race, and country of citizenship. *Id.* The dealer then contacts the NICS Operations Center and

3

provides the purchaser's name, sex, date of birth, and state of residence to initiate the background check. *See* 28 C.F.R. § 27.5(a).

On the back end, the NICS Operations Center[2] uses the potential purchaser's information to search FBI-maintained databases—such as the NICS index, the National Criminal Information Center's Violent Gang and Terrorist Organization File ("VGTOF"), and the Interstate Identification Index—for signs that the potential purchaser is prohibited from purchasing or possessing firearms. *See id.* at § 25.6. If that search produces disqualifying information, the NICS Operations Center informs the dealer that the transaction should be denied. *Id.* at (c)(1)(iv)(C). If that search produces no signs of disqualifying information, the NICS Operations Center informs the dealer that the transactions may proceed. *Id.* at (c)(1)(iv)(A). If the search produces information that indicates the potential purchaser *might* be disqualified from purchasing or possessing a firearm, the NICS Operations Center informs the dealer that the transaction must be delayed pending further research.[3] *Id.* at (c)(1)(iv)(B).

*Maintenance of Records Related to NICS Background Checks*

These background check procedures produce two types of records: Form 4473 and NICS transaction records. As noted above, Form 4473 contains the potential purchaser's personal information. 27 C.F.R § 478.124(c)(1). It also requires the dealer to record certain transactions details, including the date on which the dealer contacted the NICS Operations Center, the unique number assigned by the NICS Operations Center to the transaction, and the result of the background check. *Id.* at (c)(3). If the sale of the firearm is completed, the dealer must also

---

[2] In some states, Brady Act background checks are processed by designated state and local criminal justice agency point-of-contacts. *See* 28 C.F.R. §§ 25.2, 25.6(a), (d). In New York, all Brady Act background checks are processed by the FBI. Bureau of Alcohol, Tobacco, Firearms and Explosives, *Permanent Brady State Lists* (Sept. 22, 2016), https://www.atf.gov/rules-and-regulations/permanent-brady-state-lists.

[3] Upon receiving a "delayed" response, the dealer must wait up to three business days to receive a subsequent "proceed" or "denied" response. 28 C.F.R. 25.6(c)(1)(iv)(B). If the dealer does not hear from the NICS Operations Center within three business days, the dealer may complete the transaction. *Id.*

4

record the manufacturer, importer, type, model, caliber, and serial number of the firearm sold. *Id.* In the case of a completed sale, the dealer is required to keep a copy of the Form 4473 for 20 years. *Id.* If the sale is not completed, the dealer is only required to keep a copy of the form for five years. *Id.*

NICS transaction records include the NICS index and audit log. 28 C.F.R. § 25.9(a)-(b). The index documents transactions that the background check finds would violate state or federal law. *Id.* at (a). The audit log, which is generated automatically, records certain information about each background check that the NICS Operations Center conducts. *Id.* That information includes the date and time of the inquiry, the potential purchaser's identifying information, and the unique number assigned to the transaction. *Id.* While the NICS Operations Center retains the index of transactions that would violate state or federal law indefinitely, the center continuously purges information—other than the unique number and date of each transaction—from the audit log. *Id.* at (a)-(b). Information regarding denied transactions remains in the audit log for ten years. *Id.* at (b)(1)(i). Information about delayed transactions remains in the audit log for 90 days. *Id.* at (b)(1)(ii). The most sensitive information, identifying information connected to approved transactions, is destroyed within 24 hours. *Id.* at (b)(1)(iii).

Just as it regulates retention of these records, the Brady Act regulates access to them. The government may access a completed Form 4473 in only three circumstances: during a routine inspection of the dealer, when the dealer goes out of business and is not replaced by a successor, or in the course of a criminal investigation. 18 U.S.C. § 923(g). Similarly, the NICS index may only be accessed for purposes unrelated to NICS background checks when providing information related to issuing a firearm permit, in response to an inquiry from the Bureau of Alcohol, Tobacco, Firearms, and Explosives in connection with a civil or criminal law

enforcement activity, or for the purpose of disposing firearms in the possession of a government agency. 28 C.F.R. § 25.6(j). The NICS audit log, however, may only be accessed for administrative purposes, such as analyzing system performance, and to support investigations and inspections of dealers. *Id.* at § 25.9(b).

### *Background Checks Involving Terrorist Watch List Records*

On September 16, 2003, President George W. Bush directed the Attorney General to establish an organization to streamline terrorist watch list records generated and maintained by various federal agencies. Press Release, Office of the Press Secretary, President George W. Bush, Homeland Security Presidential Directive on Integration and Use of Screening Information (Sept. 16, 2003), https://fas.org/irp/offdocs/nspd/hspd-6.html. Accordingly, the Attorney General established the Terrorist Screening Center ("TSC"). 49 C.F.R. § 1560.3 (2008). In line with the President's command, the TSC consolidated various terrorist watch lists into the Terrorist Screening Database ("TSDB"). *Id.*

Plaintiffs allege that, shortly after the TSC created the TSDB, the NICS Operations Center began searching the TSDB when conducting NICS background checks. ECF No. 3, ¶ 19. Plaintiffs allege that, when the NICS Operations Center finds that a potential firearms purchaser matches a known or suspected terrorist listed in the TSDB, the NICS Operations Center illegally compiles, retains, and discloses information about that sale. *Id.* at ¶¶ 25-30. Specifically, Plaintiffs allege that "[t]he FBI republishes the confidential, personal information from the NICS [background checks] to numerous other agencies, foreign governments, and private contractors." ECF No. 3, ¶ 29. Further, Plaintiffs allege that these practices are not in fact related to counterterrorism, that Defendants have "misled" the public under the guise of "national

security," and that Defendants actually intend "to create a national registry of firearms owners and firearms." ECF No. 9-7 at 3.

Plaintiffs provide no factual support for their conclusory allegations of national security "smoke and mirrors," *see* ECF No. 3, ¶ 36, wide FBI disclosures of confidential information to foreign governments and private contractors, *see id.* at ¶ 29, and the government's desire to create a registry of gun owners. *See id.* at ¶¶ 42-47. However, in support of their allegations that Defendants take antiterrorism, investigative measures in the course of conducting NICS background checks, Plaintiffs cite the testimony of a former Attorney General, an FBI statement to Congress, Government Accountability Office reports and correspondence, and Congressional Research Service reports. *See generally*, ECF Nos. 12-13; *see also* ECF No. 9-7 at 9-18. As discussed in greater detail below, those exhibits suggest that the NICS Operations Center searches the TSDB during NICS background checks and compiles, retains, and discloses information related to transactions involving known or suspected terrorists.

Plaintiffs' allegations and exhibits suggest that, in the early 2000s, the FBI changed its policies surrounding the role of terrorism-related intelligence in NICS background checks. *See* ECF No. 9-7 at 10 (citing U.S. GOV'T ACCOUNTABILITY OFFICE, GOA-05-127, GUN CONTROL AND TERRORISM: FBI COULD BETTER MANAGE FIREARM-RELATED BACKGROUND CHECKS INVOLVING TERRORIST WATCH LIST RECORDS (2005) [hereinafter GOA 2005]). While terrorism-related intelligence had always been present in the databases searched during NICS background checks, NICS agents conducting firearms background checks had not always been notified when a potential purchaser matched a known or suspected terrorist. *See* GOA 2005 at 7 ("Although NICS checks have included searches of terrorist records in VGTOF, NICS personnel . . . historically did not receive notice when there were hits on these records."). Further, the

terrorism-related intelligence present in the databases searched during NICS background checks became more robust after the TSC consolidated the various terrorists watch lists into the TSDB.[4] *Id.* at 11. ("[T]he FBI and TSC have implemented procedures that allow all eligible records in the [TSDB] to be added to the VGTOF and searched during NICS background checks.").

Additionally, Plaintiffs' allegations and exhibits suggest that, when the NICS Operations Center discovers a match between a potential firearms purchaser and a name listed in the TSDB, Defendants take certain investigative measures. *See* ECF No. 9-7 at 10 (citing *Terrorist and Guns: The Nature of the Threat and Proposed Reforms Before Comm. On Homeland Sec. and Gov't Affairs*, 111th Cong. 24-26 (2010) (statement of Daniel D. Roberts, Assistant Dir., Criminal Justice Info. Servs. Fed. Bureau of Investigation) [hereinafter Statement of Daniel D. Roberts]). When there is a match between a potential firearms purchasers and a known or suspected terrorist, the NICS agent conducting the background check informs the dealer that the transactions is "delayed" for further research. *See* Statement of Daniel D. Roberts. The NICS agent then attempts to gather more information about the potential purchaser from the dealer and contacts the FBI's Counterterrorism Division. *Id.* The Counterterrorism Division determines whether there the FBI is currently investigating the potential purchaser and, if so, whether the casefile contains any information that would disqualify the potential purchaser from purchasing or possessing a firearm under the Gun Control Act. *Id.* Regardless of whether the transaction is completed, the encounter is noted and the information is disclosed to counterterrorism and foreign intelligence agencies at the state and federal level. *Id.* ("In this situation, in a given

---

[4] According to the FBI, NICS Operations Center was not previously notified of a match between a potential purchaser and a known or suspected terrorist because being a known or suspected terrorist did not disqualify the potential purchaser from owning or possessing a gun. GOA 2005 at 7. However, the Bureau changed its policy, and enhanced the terrorist-intelligence included in the databases it searches during NICS background checks, because the file on the known or suspected terrorist is sometimes more accurate and up-to-date. *Id.* (noting that an audit of NICS transactions revealed that, "[i]n one instance involving a VGTOF record, . . . an FBI field agent had knowledge of prohibiting information not yet entered into the automated databases checked by NICS").

investigation, the attempt may, in combination with other factors, lead to enhanced investigative methods, such as surveillance. . . . In addition, this new piece of intelligence is provided to the National Counterterrorism Center and, in turn, to the U.S. Intelligence Community. Federal and state law enforcement partners are also notified as appropriate.").

**DISCUSSION**

Plaintiffs argue that, by searching the TSDB in the course of conducting NICS background checks and compiling, retaining, and disclosing a potential purchaser's personal information when a match is found, Defendants violate the Second Amendment, Procedural and Substantive Due Process, the Fourth Amendment, the Equal Protection Clause, and the Administrative Procedure Act. ECF No. 3 at ¶¶ 111-38. Before reaching the merits of Plaintiffs' arguments, the Court must ensure that Plaintiffs have standing to challenge this conduct. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) ("We have an obligation to assure ourselves of litigants' standing under Article III."); *Ontario Pub. Serv. Emps. Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F.3d 27, 34 (2d Cir. 2004) ("In order for our court to properly reach the merits of the case . . . we must first find that the parties involved have met the basic requirements of standing."). The Court finds they do not.

**I. Article III Standing**

Article III of the Constitution limits the jurisdiction of the Federal Judiciary to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. In doing so, Article III enshrines "the proper—and properly limited—role of the courts in a democratic society." *DaimlerChrysler*, 547 U.S. at 340. The doctrine of standing enforces Article III's case-or-controversy requirement. *Id.* at 342; *see also Clapper v. Amnesty Intern. USA*, 133 S.Ct. 1138, 1146 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the

judicial process from being used to usurp the power of the political branches."). To that end, the doctrine of standing establishes an "irreducible constitutional minimum," which ensures that a plaintiff has alleged a "particularized" injury that affects the plaintiff in a "personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1, 561 (1992).

The irreducible constitutional minimum of standing requires three things: First, the plaintiff must allege "an injury in fact"—a harm suffered by the plaintiff personally that is "concrete and actual or imminent, not conjectural or hypothetical." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103 (1998). Second, the plaintiff must demonstrate a "fairly traceable" causal connection "between the plaintiff's injury and the complained-of conduct of the defendant." *Id.* Finally, there must be "a likelihood that the requested relief will redress the alleged injury." *Id.*; s*ee also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982) ("[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that injury fairly can be traced to the challenged conduct and is likely to be redressed by a favorable decision.") (internal quotation marks and citations omitted).

Beyond that irreducible constitutional minimum, the Supreme Court has identified certain prudential standing limitations. One of those limitations is that "when the asserted grievance is a generalized grievance shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). That is because "other governmental institutions" may be more competent to address "questions of wide public significance." *Id.* at 500. Another of those limitations is that the power to seek judicial review belongs to "those who have a direct stake in the outcome,"

rather than "concerned bystanders who will use it simply as a vehicle for the vindication of value interests." *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (internal quotation marks omitted). Underlying each of these prudential limitations is a fundamental principle of our democracy— "The province of the court is, solely, to decide on the rights of individuals." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803).

In line with that democratic prerogative, the standing inquiry is "especially rigorous" where reaching the merits of a dispute involves deciding "whether an action taken by one of the other two branches of Federal Government was unconstitutional." *See Clapper*, 133 S.Ct. at 1147. The inquiry is more rigorous still where reaching the merits of the dispute involves "intelligence gathering and foreign affairs." *Id.* at 1147 (citing *United States v. Richardson*, 418 U.S. 166, 188 (1974) (finding the plaintiff lacked standing to compel the Central Intelligence Agency to publish information regarding how it spends its funds), *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 221–222 (1974) (finding the plaintiff lacked standing to challenge the Armed Forces Reserve membership of members of Congress), and *Laird v. Tatum*, 408 U.S. 1, 11-16 (1972) (finding the plaintiff lacked standing to challenge an intelligence-gathering program)).

Plaintiffs suggest three bases for standing to contest the constitutionality of the challenged conduct. ECF No. 3. First, Plaintiffs argue that the challenged conduct directly invades their legally protected interests because each Plaintiff "has completed an ATF Form 4473 since February 2004" and "wants to continue to purchase firearms through federally-licensed dealers." ECF Nos. 3, ¶ 80; 9-7 at 37-87. Second, Plaintiffs suggest that they have standing because the challenged conduct has forced them "to choose [among] their Second Amendment rights, their First Amendment rights, and other, valuable civil liberties." *Id.* at ¶84;

11

9-7 at 39. Third, Plaintiffs' Amended Complaint seems to suggest that Plaintiffs have been injured because the challenged conduct stigmatizes them as "terrorists and potential terrorists." ECF No. 3, ¶ 125. Each basis for standing is addressed below.

### a. Direct Invasion of Interests

Plaintiffs' first assert standing on the basis of a direct invasion into their personal interests. *See* ECF No. 9-7 at 37. Plaintiffs allege that, since February 2004, when conducting NICS background checks, Defendants have searched databases containing counterterrorism intelligence and information. ECF No. 3, ¶¶ 19, 24. Plaintiffs further allege that, when a match between a potential purchaser and a known or suspected terrorist is found, the FBI has compiled, retained, and disclosed to third parties the potential purchasers' confidential information. ECF No. 3, ¶¶ 25-30. Plaintiffs allege that this conduct has injured them directly because each Plaintiff has completed a Form 4473 since February 2004 and wants to purchase firearms from federally licensed dealers in the future. ECF No. 3, ¶ 81.

In response to those allegations, Defendants argue that completing Form 4473 and wanting to purchase firearms in the future does not confer standing on Plaintiffs. Defendants argue that Plaintiffs fail to allege "that they have ever had their own personal information gathered" or that "their own personal information was ever improperly disclosed to other law enforcement agencies or to a private entity." ECF No. 6-1 at 10-11.

The Court agrees with Defendants. Plaintiffs' allegations demonstrate that known or suspected terrorists listed in the TSDB who have purchased or seek to purchase firearms have sustained or are in imminent danger of sustaining an injury as a result of the challenged conduct. But Plaintiffs do not allege that *they* are listed as known or suspected terrorists in the TSDB. Nor do Plaintiffs allege facts that would raise a plausible inference that they are listed as known

or suspected terrorists in the TSDB. Simply put, Plaintiffs' allegations do not demonstrate that the challenged conduct harms them personally.

To challenge a government policy or program, a plaintiff must demonstrate either that they have been subjected to the challenged conduct or that they are substantially likely to be subjected to the challenged conduct in the future.[5] In *O'Shea v. Littleton*, the Supreme Court found that the plaintiffs did not have standing to challenge racial discrimination in their city's issuance of bond and imposition of criminal sentences because they had only alleged "general assertions or inferences" that they would be subjected to the challenged conduct. 414 U.S. 488, 497-98 (1974). There, the plaintiffs' alleged injury relied on speculation that the plaintiffs would be arrested and then subsequently treated in a discriminatory manner. *Id.* Because the plaintiffs' allegations did not point to any imminent prosecutions contemplated against them, or even suggest that the plaintiffs expected to violate any criminal laws, the Court found the threat of injury from the challenged conduct was "too remote to satisfy the case-or-controversy" requirement. *Id.* at 498.

More recently, in *Clapper v. Amnesty USA*, the Supreme Court found that a group of attorneys, journalists, and human rights organizations did not have standing to challenge a government surveillance program because they could not demonstrate that their communications

---

[5] To be clear, a plaintiff must demonstrate standing to seek each form of relief sought. *Allen v. Wright*, 468 U.S. 737, 755 (1984), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct 1377, 1387-88 (2014) ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."); *see also Laidlaw*, 528 U.S. at 185 ([A] plaintiff must demonstrate standing separately for each form of relief sought."). Accordingly, to seek damages for past conduct, Plaintiffs must demonstrate that they have been injured by the challenged conduct in the past, *see City of Los Angeles*, 461 U.S. 95 (1983) (finding the plaintiff, who had been choked by a police officer, had standing to seek damages for the past conduct), and to seek an injunction to prevent future conduct, Plaintiffs must demonstrate that a substantial likelihood that they, personally, will be the object of the challenged conduct in the future. *Id.* (finding that same plaintiff did not have standing to seek injunctive relief because he could not demonstrate a sufficient likelihood that "he would suffer future injury from the use of chokeholds by police officers"). Plaintiffs here seek both forms of relief but demonstrate neither type of injury.

would be intercepted.[6] *Clapper*, 133 S.Ct. at 1138. The Court rejected the plaintiffs' theory that their injury was concrete and imminent because their contacts abroad were the type of individuals whom the policies at issue would target. *Id.* at 1148. Indeed, the Court highlighted a plaintiff's statement that he had "no choice but to *assume*" that his communications with his foreign contacts "*may* be subject to government surveillance." *Id.* (emphasis added in original).

Like the plaintiffs in *O'Shea* and *Clapper*, Plaintiffs fail to demonstrate that they have been, or will be, personally injured by the challenged conduct. Plaintiffs assert that they can establish a direct and personal injury flowing from the challenged conduct because they each have completed Form 4473 and want to continue to purchase firearms from federally licensed dealers in the future. But Plaintiffs are not challenging provisions of the Brady Act or even NICS background checks generally. Rather, Plaintiffs challenge the antiterrorism measures that they allege have become a routine part of some NICS background checks. The problem is, Plaintiffs do not allege facts that demonstrate they have been, or will be, personally affected by those measures.

Plaintiffs have not alleged that the FBI has compiled, retained, or disclosed their personal information. Plaintiffs have not alleged that they are listed in the TSDB as known or suspected

---

[6] Plaintiffs attempt to distinguish the conduct challenged in *Clapper*. *See* ECF No. 9-7 at 8, 38-39. To be sure, the regulatory framework at issue in *Clapper* merely allowed federal officials to *apply* for authorization to engage in the surveillance that the plaintiffs feared. *Clapper*, 133 S.Ct. at 1149. In contrast, Plaintiffs challenge investigatory practices that have been put in place. *See* ECF No. 3, ¶¶ 19-30. Thus, the injury in *Clapper* was even more hypothetical and conjectural. *Clapper*, 133 S.Ct. at 1149. But this is a distinction without a meaningful difference. In *Clapper*, the plaintiffs failed to offer evidence that their communications would be monitored. *Id.* at 1148. Although the structure of the regulatory framework further undermined the plaintiff's theory of standing, the Court emphasized that the plaintiffs had "set forth no specific facts" demonstrating that their communications would be monitored. *Id.* at 1149. Indeed, in emphasizing that failure, the Court cited the Sixth Circuit's decision in *American Civil Liberties Union v. National Sec. Agency*, 493 F.3d 664 (2007). The plaintiffs in *ACLU* sought to challenge an actual program of surveillance that the President had already authorized. *ACLU*, 493 F.3d at 648 n.1. But the court found the plaintiffs did not have standing to do so because they lacked evidence that their communications had been intercepted. *Id.* at 665-656, 673-674. Similarly, here, Plaintiffs challenge a policy that they allege has already been authorized and put into effect. Plaintiffs put themselves one step closer to the policy at issue than did the plaintiffs in *Clapper*. But like the plaintiffs in both *Clapper* and *ACLU*, Plaintiffs in this case have failed to allege facts that demonstrate they have been, or likely will be, the object of that policy. That failure thwarts their theory of standing.

terrorists. Plaintiffs do not even allege that their NICS background checks have resulted in "delayed" transactions, a fact that might give rise to a reasonable inference that they have been the object of the challenged conduct.[7] Just as Plaintiffs do not allege that they have been subjected to the antiterrorism measures that they challenged, they do not allege that they will, in the future, be subjected to that conduct. Like the plaintiffs in *O'Shea*, Plaintiffs here do not point to any imminent counterterrorism investigations contemplated against them. Nor do Plaintiffs suggest that they expect to behave in a manner that might lead to a counterterrorism investigation. Further, like the plaintiffs in *Clapper*, the affidavits of Plaintiffs in this case rely on speculation that they *might be* subjected to the challenged conduct. *See, e.g.*, ECF No. 9-3 (Affidavit of Michael P. Carpinelli) ("*What if* my name is slipped on the [TSDB]? I *would* lose my right to defend myself, my family, my community, my livelihood.") (emphasis added). Because the injury that Plaintiffs assert is necessarily contingent on Plaintiffs being deemed known or suspected terrorists, these failures are fatal to Plaintiffs' theory of standing.

Plaintiffs also argue that if the Court finds that they do not have standing, Defendants' conduct could not be challenged. ECF No. 9-7 at 40. That argument is both legally and factually flawed. First, it is well established that the argument that "no one would have standing to sue" is not itself a reason to find standing. *Clapper*, 133 S.Ct. at 1154 (citing *Valley Forge Christian College*, 454 U.S. at 489). Second, this decision does not shield Defendants from

---

[7] Plaintiffs allege that, "[w]hen the FBI believes that a potential customer is a match to someone in the [TSDB], . . . the FBI uses the 'delay' sequence to create a three business-day window to elicit further information about the potential customer, including, but not limited to, learning the manufacturer, model, and serial number of the potential firearm to be purchased." ECF No. 3, ¶ 33. Plaintiffs also provide exhibits that support this allegation. *See, e.g.*, Statement of Daniel D. Roberts (explaining that, when a potential purchaser matches a known or suspected terrorist listed in the TSDB, "the NICS examiner informs [the dealer] the transaction is delayed for further research and transfers the transaction to the NICS Command Center"); *see also* GOA 2005 at 2 ("[A]ll NICS transactions with potential or valid matches to terrorist watch list records are automatically delayed to give NICS personnel the chance to further research the transaction for prohibiting information before a response (e.g., proceed or denied) is given to the initiator of the background check."). But Plaintiffs do not allege that, when they have attempted to purchase firearms, their NICS background checks resulted in delayed transactions.

15

judicial review. This decision merely requires, consistent with the irreducible, constitutional minimum requirements of standing, that a plaintiff seeking judicial review demonstrate that they have been injured by the challenged conduct. "The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process." *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972). Rather, the doctrine of standing shields the constitutional prerogatives of the executive—including the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed,"—from unnecessary interference by plaintiffs whose rights are not personally violated. *See Laird*, 408 U.S. at 15.

### b. Chilling Effect

Plaintiffs next assert standing based on the effect of the challenged conduct on the exercise of their constitutional rights. *See* ECF No. 9-7 at 39. Plaintiffs allege that Defendants' conduct forces them to choose between their First and Second Amendment rights, among other civil liberties. ECF No. 3, ¶ 84. Plaintiffs claim "the actions of the Defendants create immediate and total interference with the statutory and public expectations regarding the purchase of a firearm." ECF No. 9-7 at 39. Defendants argue in response that Plaintiffs have fallen short of demonstrating a concrete and particularized injury because they have not identified "a single instance on which they were precluded from exercising their civil liberties." ECF No. 6-1 at 11.

The Court finds this to be an insufficient basis for standing. The injury asserted under this theory of standing does not arise directly from Defendants' conduct; rather, under this theory Plaintiffs are injured because the possibility that Defendants will intercept their personal information for counterterrorism purposes has chilled the exercise of their constitutional rights.

But the possibility that Defendants will intercept their personal information for counterterrorism purposes is still too remote to confer standing.

Allegations of a remote, "subjective chill" do not satisfy Article III's case-or-controversy requirement. *Laird*, 408 U.S. at 13-14. In *Laird*, the plaintiffs argued that their exercise of their First Amendment rights was being "chilled by the mere existence, without more, of [the Army's] investigative and data-gathering activity." *Id.* at 10. While acknowledging that prior cases have held that constitutional violations may arise from the chilling effect of "regulations that fall short of a direct prohibition against the exercise of First Amendment rights," the Supreme Court declared that none of the plaintiffs in those cases asserted chilling effect arising "merely from the individual's knowledge that a governmental agency was engaged in certain activities." *Id.* at 11. Noting that the plaintiffs had not connected the existence of the surveillance program to their own speech, the Court held that the plaintiffs' allegations of a subjective chill were "not an adequate substitute for a claim of specific present objective harm or a threat of a specific future harm." *Id.* at 13-14.

Like the plaintiffs in *Laird*, Plaintiffs here allege that the exercise of their constitutional rights has been chilled by the mere existence of the challenged conduct. *See* ECF No. 3, ¶ 84. Plaintiffs allege that they are "being forced to choose between their Second Amendment rights, their First Amendment rights, and other, valuable civil liberties." *Id.* But Plaintiffs fail to demonstrate any likelihood that they will be subjected to the government actions they fear. Mere knowledge that NICS background checks trigger counterterrorism efforts when some individuals attempt to purchase firearms is not enough. *See Laird*, 408 U.S. at 11. Just as in *Larid*, the chilling effect here is too remote to confer standing on Plaintiffs.

17

### c. Stigmatization

Plaintiffs' Amended Complaint seems to suggest a third basis for standing. Plaintiffs suggest that Defendants conduct injures firearms purchasers because it associates them with terrorists. Plaintiffs submit that searching the TSDB in the course of conducting an NICS background check "result[s] in their stigmatization as terrorists and potential terrorists." ECF No. 3, ¶ 125. Defendants argue that Plaintiffs' alleged stigma is not sufficient to demonstrate an injury because Plaintiffs "have not made any assertion of harm flowing from such alleged stigmatization." ECF No. 6-1 at 11. The Court agrees that Plaintiffs' alleged stigma is not a sufficient basis for standing.

An injury rooted in the stigmatizing effect of government conduct "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Allen*, 468 U.S. at 755 (collecting cases). In *Allen*, the Supreme Court held that the African American plaintiffs did not have standing based on a stigma resulting from discrimination against other African Americans. *Id.* at 761. The Court found such an injury to be "abstract" and "not judicially cognizable." *Id.* at 755.

Here, Plaintiffs seem to suggest that they have been stigmatized as "terrorists and potential terrorists" because other potential firearms purchasers, whom the FBI considers known or suspected terrorists, have had some of their personal information compiled, retained, and disclosed. *See* ECF No. 3, ¶ 125. But Plaintiffs do not allege that they have been subjected to the conduct that creates the stigma. For that reason, Plaintiffs' alleged stigma, like the stigma asserted in *Allen*, is not "judicially cognizable." *Id.* at 755.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss (ECF No. 6) is GRANTED. Plaintiffs' Amended Complaint is dismissed without prejudice, and the Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

Dated: April 10, 2017
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court